Victoria L. VARGO, Appellee

v.

Richard K. SCHWARTZ, Appellant.

Superior Court of Pennsylvania.

Argued July 11, 2007.

Filed Dec. 31, 2007.

Hilary A. Spatz, Pittsburgh, for appellant.

Alida J. Kornreich, Pittsburgh, for appellee.

BEFORE: HUDOCK, STEVENS, and McCAFFERY, JJ.

OPINION BY McCAFFERY, J.:

¶ 1 Appellant, Richard K. Schwartz, appeals from the trial court order directing him to provide support for two children. Specifically, Appellant asks us to determine whether the trial court committed reversible error by failing to conclude that the children were born of the marriage between Appellee (Victoria L. Vargo, the children's mother) and her husband. Following careful review, we affirm.

¶ 2 The facts and procedural history underlying this case are as follows. Appellee (hereinafter "Mother") married Kevin Var-

go in 1989 and remained married to him at all times relevant to this case; however, the marriage was troubled and the couple separated on several occasions. Mother has four children: two boys, T.V. and J.J., born December 31, 1989, and July 27, 1991, respectively, and two girls, K.V. and S.V., born January 14, 2002, and May 28, 2003, respectively. Mr. Vargo is the biological father of T.V., and Hugh Johnston is the biological father of J.J. The identity of the girls' father is at issue in the instant case.

¶ 3 In February 2004, Mother filed a complaint against Appellant, seeking support for the two girls. Following consensual genetic testing of Mother, Appellant, and the two children, the court issued an order directing Appellant to pay child support on an interim basis while proceedings to address his defense to paternity were conducted. During these proceedings, Appellant made two arguments: (1) the presumption of paternity should apply, which would make Mr. Vargo, as Mother's husband, the presumptive father of the children; and (2) Mother was estopped from proceeding against Appellant for child support because Mother and Mr. Vargo had held the girls out as children of their marriage.

¶ 4 In September 2004, the hearing officer recommended that the presumption of paternity not be applied because the Vargo family was not intact, and also that paternity by estoppel not be applied because Mr. Vargo had held himself out as the father of the girls for only a short time, until Mother revealed her deception and informed him that he was not the girls' biological father. The court accepted the hearing officer's recommendations and denied the exceptions Appellant had filed.[1]

---

1. Appellant filed an appeal from the order, which this Court quashed as interlocutory be-

Appellant then filed a motion seeking recusal of the trial judge, which, following a hearing, the trial court denied on April 8, 2005.

¶ 5 After being continued three times, a final support hearing was held on October 17, 2006. A court order followed on November 29, 2006, adopting the officer's recommendations that Appellant pay $1050 per month for support of the girls. Appellant filed a timely appeal in which he raises the following five issues for our review:

I. The trial court erred as a matter of law and abused its discretion in failing to apply the presumption of paternity doctrine to Mother's claim for child support.

II. The trial court erred as a matter of law in failing to apply the doctrine of paternity by estoppel to Mother's claim for child support.

III. The trial court erred as a matter of law and abused its discretion in failing to appropriately consider and weight [sic] Mother's judicial admissions which should preclude her support action.

IV. The trial court abused its discretion and erred as a matter of law when it failed to assign any significance to Mother's voluntary dismissal of the child support complaint filed against her husband, for the subject children.

V. The trial court erred as a matter of law and abused its discretion in failing to recuse itself from this matter.

(Appellant's Brief at 5).

¶ 6 In reviewing matters involving child support, we as an appellate court will not disturb a trial court order absent an abuse of discretion. *Doran v. Doran,* 820 A.2d 1279, 1282 (Pa.Super.2003) (applying this

cause no final support order had been issued. *See Vargo v. Schwartz,* No. 396 WDA 2005

standard of review to a case involving a question of paternity).

An abuse of discretion exists if the trial court has overridden or misapplied the law, or if there is insufficient evidence to sustain the order. Moreover, resolution of factual issues is for the trial court, and a reviewing court will not disturb the trial court's findings if they are supported by competent evidence. It is not enough [for reversal] that we, if sitting as a trial court, may have made a different finding.

*Id.* (citations omitted).

¶ 7 "The finder of fact is entitled to weigh the evidence presented and assess its credibility." *Smith v. Smith,* 904 A.2d 15, 20 (Pa.Super.2006). In so doing, the finder of fact "is free to believe all, part, or none of the evidence and [we as an appellate court] will not disturb the credibility determinations of the court below." *Id.* (citation omitted).

¶ 8 Our Supreme Court has summarized the analysis required for legal determination of the paternity of a child conceived or born during a marriage:

[F]irst, one considers whether the presumption of paternity applies to [the] particular case. If it does, one then considers whether the presumption has been rebutted. Second, if the presumption has been rebutted or is inapplicable, one then questions whether estoppel applies.

*Strauser v. Stahr,* 556 Pa. 83, 89, 726 A.2d 1052, 1055 (1999) (quoting *Brinkley v. King,* 549 Pa. 241, 250, 701 A.2d 176, 180 (1997) (plurality opinion)); *N.C. v. M.H.,* 923 A.2d 499, 502–03 (Pa.Super.2007) (same). We consider each of these steps in detail in the paragraphs below.

(Pa.Super. filed April 4, 2005).

¶ 9 The presumption of paternity, *i.e.,* the presumption that a child conceived or born during a marriage is a child of the marriage, has been described by our Supreme Court as "one of the strongest presumptions known to the law." *Strauser, supra* at 87, 726 A.2d at 1053–54. The policy underlying the presumption is the preservation of marriages. *Fish v. Behers,* 559 Pa. 523, 528, 741 A.2d 721, 723 (1999). Accordingly, our Supreme Court has held that the presumption of paternity applies *only* where the underlying policy to preserve marriages would be advanced by application of the presumption. *Id.; Brinkley v. King,* 549 Pa. 241, 250–51, 701 A.2d 176, 181 (1997) (plurality opinion). When there is no longer an intact family or a marriage to preserve, then the presumption of paternity is not applicable. *Fish, supra* at 528, 741 A.2d at 723; *Brinkley, supra* at 250–51, 701 A.2d at 181;[2] *Barr v. Bartolo,* 927 A.2d 635, 643 (Pa.Super.2007) (declining to apply the presumption of paternity in a case where, although the mother and her husband remained married and had not sought a divorce at the time of the paternity hearing, they had been separated for several years and there was no intact family to preserve); *Doran, supra* at 1283 (concluding that the presumption of paternity did not apply to a case in which the mother and her husband had separated and a divorce action was pending prior to the support hearing); *Sekol v. Delsantro,* 763 A.2d 405, 409 (Pa.Super.2000) (same); *cf. Strauser, supra* at 91, 726 A.2d at 1055–56 (concluding that the presumption of paternity *did* apply in a case where the mother and her husband had never separated and, despite their marital difficulties and the mother's infidelity, had chosen to preserve their marriage); *E.W. v. T.S.,* 916 A.2d 1197, 1204 (Pa.Super.2007) (affirming the trial court's application of the presumption of paternity in a case where the mother and her husband had not lived apart at any time after their marriage and had never filed a divorce complaint, and the husband had fulfilled the duties of a father in the family).

¶ 10 The presumption of paternity is unrebuttable when, at the time the husband's paternity is challenged, mother, her husband, and the child comprise an intact family wherein the husband has assumed parental responsibilities for the child. *Id.* at 1201. Under other circumstances, the presumption may be overcome by clear and convincing evidence that either of the following circumstances was true at the time of conception: the presumptive father, *i.e.,* the husband, was physically incapable of procreation because of impotency or sterility, or the presumptive father had no access to his wife, *i.e.,* the spouses were physically separated and thus were unable to have had sexual relations. *Strauser, supra* at 88, 726 A.2d at 1054; *Brinkley, supra* at 248, 701 A.2d at 179; *Barnard v. Anderson,* 767 A.2d 592, 594 (Pa.Super.2001). In Pennsylvania, impotency/sterility and non-access constitute the *only* ways to rebut the presumption of paternity. *Brinkley, supra* at 248, 701 A.2d at 179; *Barnard, supra* at 594; *see also Brinkley, supra* at 260–61, 701 A.2d at 185–86 (Newman, J., dissenting). Notably, blood tests *cannot* be offered to rebut the presumption of paternity. *Jones v. Trojak,* 535 Pa. 95, 105, 634 A.2d 201, 206 (1993) ("A court may order blood tests to determine paternity only when the presumption of paternity has been overcome ... by proof of facts establishing non-access or impotency."); *E.W., supra* at

---

**2.** Although *Brinkley* was a plurality decision, a clear majority of four justices agreed that the presumption of paternity should not be applied when there is no intact family to protect. *See B.S. v. T.M.,* 782 A.2d 1031, 1035 n. 3 (Pa.Super.2001).

1202–03, 1204; *Barnard, supra* at 594 (quoting *Strauser, supra* at 88, 726 A.2d at 1054); *see also Brinkley, supra* at 261–65, 701 A.2d at 186–88 (Newman, J., dissenting) ("Pennsylvania is fast becoming one of only a minority of states that does not accept the results of blood tests that disprove the husband's paternity to rebut the presumption [of paternity]."); *Strauser, supra* at 93, 726 A.2d at 1056 (Nigro, J., dissenting) (observing that "the strict application of the presumption [of paternity] doctrine has only acted as an obstacle to the discretion of the trial court to order and use blood testing of the parties" to determine paternity). A number of dissenting voices notwithstanding, it remains the law of this Commonwealth that "[a] court may order blood tests to determine paternity only when the presumption of paternity has been overcome" by proof of either impotency/sterility or non-access. *Brinkley, supra* at 247, 701 A.2d at 179 (citation omitted).

¶ 11 If the presumption of paternity is not applicable or has been rebutted, the court must then consider whether the doctrine of estoppel is applicable to the case. *N.C., supra* at 503; *E.W., supra* at 1205. Estoppel in paternity actions is a legal determination based on the conduct of the mother and/or the putative father with regard to the child, *e.g.*, holding out the child to the community as a product of their marriage and/or supporting the child. If the evidence is sufficient, estoppel may bar either a putative father from denying paternity or a mother from succeeding in a claim of paternity against a third party. *Fish, supra* at 528, 741 A.2d at 723; *J.C. v. J.S.*, 826 A.2d 1, 3–4 (Pa.Super.2003); *Doran, supra* at 1283. Estoppel rests on the principle that a person may not "challenge his role as a parent once he has accepted it, even with contrary DNA and blood

tests." *Warfield v. Warfield*, 815 A.2d 1073, 1077 (Pa.Super.2003).

¶ 12 The public policy behind the doctrine of estoppel has often been expressed as follows:

Estoppel is based on the public policy that children should be secure in knowing who their parents are. If a certain person has acted as the parent and bonded with the child, the child should not be required to suffer the potentially damaging trauma that may come from being told that the father he has known all his life is not in fact his father.

*Fish, supra* at 530, 741 A.2d at 724 (citation omitted); *J.C., supra* at 4 (same). As this statement of policy makes clear, the doctrine of paternity by estoppel is rooted in the best interests of the child. *Barr, supra* at 643; *N.C., supra* at 503.

¶ 13 Evidence of fraud or misrepresentation with regard to issues of paternity is relevant to the application of estoppel and must be considered by the trial court. *N.C., supra* at 503; *J.C., supra* at 4; *Doran, supra* at 1283; *Sekol, supra* at 410. In some situations, fraud can preclude the application of paternity by estoppel. *N.C., supra* at 504; *J.C., supra* at 4; *Sekol, supra* at 411. Particularly where fraud or misrepresentation is involved, courts applying the doctrine of paternity by estoppel have taken care to consider evidence of the husband's conduct toward the child not only *before* the husband learned that he was not the child's biological father, but also *after* becoming aware of his non-parentage. *N.C., supra* at 502 n. 4; *J.C., supra* at 4–5; *Doran, supra* at 1284; *Sekol, supra* at 410.

¶ 14 For example, in *Doran, supra*, this Court affirmed the trial court's dismissal of a support order issued against the appellee-presumptive father, even though he had held out the child as his own for 11

years, up until the time when he learned through DNA testing that he was not the boy's biological father. The child's mother had assured the appellee for years, both during their marriage and after their divorce, that he was the child's biological father, intentionally misleading him and never mentioning her meretricious relationship with a third party, even when the appellee had raised questions concerning the identity of the child's father. *Doran, supra* at 1284. After learning that he was not the child's father, the appellee in *Doran* removed himself as gently as possible from the child's life, although he did continue to see the child as of the time of the hearing. *Id.* at 1281, 1283. The trial court found, and this Court agreed, that the mother's deceit and misrepresentations as to the identity of her child's father precluded application of paternity by estoppel. The panel reasoned that the appellee would not have held the child out as his own had it not been for the mother's fraudulent conduct. *Id.* Furthermore, the panel was loath to apply estoppel because to do so under the circumstances presented "would punish the party that sought to do what was righteous and reward the party that has perpetrated a fraud." *Id.* at 1283–84 (citation omitted); *see also N.C., supra* at 504–05 (relying on *Doran* to conclude that estoppel was not applicable in a case where the mother's misrepresentations had caused her husband to believe that he was the father of mother's child for over a decade).

¶ 15 A different result eventuated in *J.C., supra,* another case in which a wife had misled her husband for years as to the identity of her child's father. Six months prior to the child's birth, the husband had learned that his wife was engaging in an extramarital affair, but the parties reconciled and continued to live as an intact family for six more years. Although the husband harbored suspicions about the identity of the child's biological father, the husband at all times and in all ways assumed the role of father to the child, to the point of seeking custody of the child after the parties separated. *Id.* at 3. Even after the wife admitted to her husband that he was not the child's biological father, the husband continued to treat the boy as his son. Therefore, the trial court applied the doctrine of paternity by estoppel and denied the husband's petition to modify his child support payments. *Id.* at 5. This Court affirmed, distinguishing *J.C.* from *Doran* by the fact that, in the former case but not the latter, the ex-husband continued to treat the child as his own even after learning that he was not the biological father. *J.C., supra* at 4–5.

¶ 16 In another case involving misrepresentation, our Supreme Court affirmed this Court's decision to estop a mother-appellant from asserting that the appellee, a man with whom she had had an extramarital affair, was the biological father of her child. *Fish, supra* at 526–27, 741 A.2d at 722. The child was born during mother's marriage, but mother did not inform her husband that he was not the child's father. Although the husband did on occasion express doubt as to his paternity, the mother repeatedly assured him that he was indeed the child's father. However, when the boy was three years old, the mother finally told her husband that he was not the child's biological father, a fact that was confirmed by blood tests. After the mother and her husband were divorced, the mother filed a child support action against the biological father. Although the trial court found that the mother could proceed with her support action, this Court reversed, holding that mother was estopped from pursuing the action. In affirming this Court's decision, our Supreme Court noted that mother and her husband had continued to hold the child

out to the community as a child of their marriage, even after their separation. Furthermore, the husband maintained a father-son relationship with the child even after the marriage ended, and the child continued to believe that mother's husband was his father. Therefore, the Court reasoned, forcing the child into a relationship with his biological father at that time was not in the best interests of the child. *Id.* at 529–30, 741 A.2d at 724.

¶ 17 As the above cases make clear, whether a court invokes paternity by estoppel can turn on small details of fact specific to a given set of circumstances.[3]

¶ 18 In the case *sub judice,* Appellant's first two issues are challenges to the trial court's determination that neither the presumption of paternity nor the doctrine of paternity by estoppel apply to the facts presented. We cannot accept Appellant's arguments, for the reasons discussed in detail below.

¶ 19 In considering whether the presumption of paternity was applicable in the instant case, the trial court determined that Mother and Mr. Vargo did not have an intact marital relationship and there was no marriage to preserve. The trial court therefore concluded that applying the presumption of paternity was not warranted, since to do so would not advance the policy underlying the presumption, *i.e.,* preservation of a marriage. *See Fish, supra* at 528, 741 A.2d at 723; *Brinkley, supra* at 250–51, 701 A.2d at 181; *Barr, supra* at 643; *Doran, supra* at 1283. There is evidence of record, summarized by the trial court in the following paragraph, to support the trial court's determination that "the record established a broken marriage and family that were not magically restored by [Mr.] Vargo's periodic visits or episodic sex between the parties." *Vargo v. Schwartz,* 81 Pa. D. & C.4th 1, 10 (Pa.Com.Pl.2007).

---

3. We note that judicial decisions regarding application of the doctrine of paternity by estoppel have prompted numerous dissenting opinions. Some have argued that the doctrine should not be so strictly applied. For example, Justice Nigro, joined by Justice Newman, in dissent from the majority opinion in *Fish, supra,* concluded the following:

> This situation is a perfect example of why I believe that our courts should abandon the strict application of the estoppel doctrine and grant trial courts the discretion to order paternity blood tests and then consider such evidence along with other factors relevant to the best interests of the child involved. Such an approach would not only prevent biological fathers from using the estoppel doctrine as a vehicle for insulating themselves from parental responsibilities but would also ... work to eliminate situations where a man is deceived into believing he is the father and is then made to bear legal responsibility, by reason of estoppel, for a child that is not his.

*Fish, supra* at 531–32, 741 A.2d at 725 (Nigro, J., dissenting) (citation omitted).

In *DiPaolo v. Cugini,* 811 A.2d 1053, 1057 (Pa.Super.2002), Judge Hudock, in dissent, cited Justice Nigro's dissenting opinion in *Fish* to argue that paternity by estoppel should not be applied in a case where a DNA test performed under a New Jersey court order excluded the husband as the father of twin boys.

In *Lynn v. Powell,* 809 A.2d 927, 931 (Pa.Super.2002), Judge Bowes, in dissent, argued that paternity by estoppel should not apply in a case where the mother and her husband reconciled and maintained their marriage following the mother's brief affair, while acknowledging publicly, and at the earliest possible time, that the husband was not the father of mother's child.

Judge Tamilia, on the other hand, has argued for a strict application of the doctrine of estoppel. *See, e.g., Kohler v. Bleem,* 439 Pa.Super. 385, 654 A.2d 569, 580 (1995) (Tamilia, J., dissenting) (arguing that to provide the fullest protection to the children involved, a determination of paternity by estoppel should not be overcome by a finding of fraud with respect to the specific identity of the biological father).

¶ 20 Mother testified that she and Mr. Vargo had separated numerous times during their marriage. The most recent separation, which began in October 2003, was prompted by Mother's revelations to Mr. Vargo that he was not the father of the two young girls at the center of the instant dispute. (Notes of Testimony ("N.T."), 9/24/04, at 9, 11). Although Mother testified that Mr. Vargo had lived with her and her children "on and off" since the October 2003 separation, Mr. Vargo testified that he resided with Mother only when he had nowhere else to stay. (*Id.* at 10, 12–13, 81). Mother further testified that efforts to reconcile with Mr. Vargo had failed. (*Id.* at 30). Mother had filed for divorce (although no action had been taken on that filing as of the time of the support hear-

ing),[4] and Mr. Vargo in his testimony spoke of a time "when we get divorced." (*Id.* at 11, 80).

¶ 21 Whether the family is intact and there is a marriage to preserve are questions of fact, which, like all questions of fact, fall squarely within the realm of the fact-finder. The evidence summarized above supports the trial court's findings of fact as to the status of the family and the marriage at issue.[5] Furthermore, the trial court correctly summarized the law regarding the presumption of paternity and applied it to these facts. Accordingly, we will not disturb the trial court's decision, and we conclude that Appellant's first contention—that the trial court abused its discretion in failing to apply the presumption of paternity—has no merit.[6]

4. Appellant alleges that a divorce complaint had remained of record since 1990. (Appellant's Brief at 12). There is absolutely no support for this allegation in the record. Mother's undisputed testimony was that she had filed for divorce in November 2003, and then reinstated the divorce action in February 2004. (Notes of Testimony ("N.T.") *Vargo v. Johnston* hearing, 9/14/04, at 88–89). (The transcript of the *Vargo v. Johnston* hearing was admitted into evidence on Appellant's motion in the instant case.)

5. Appellant complains that the "trial court narrowly relied on just a few pages" of the testimony from the September 24, 2004 hearing. (Appellant's Brief at 12). We remind Appellant that "[t]he finder of fact is entitled to weigh the evidence presented and assess its credibility," and in doing so "is free to believe all, part, or none of the evidence." *Smith v. Smith*, 904 A.2d 15, 20 (Pa.Super.2006). Even when there is contradictory testimony— or perhaps *especially* when there is contradictory testimony—the "trial court as the fact[-]finder [ ] is entitled to weigh the evidence and assess the credibility of the witnesses." *E.W. v. T.S.*, 916 A.2d 1197, 1202 (Pa.Super.2007). When, as here, the trial court's findings are supported by competent evidence, we as an appellate court will not disturb them. *Doran v. Doran*, 820 A.2d 1279, 1282 (Pa.Super.2003).

6. We acknowledge that the determination of the status of the Vargo marriage was a close and difficult call. Only two witnesses testified at the hearing—Mother and Mr. Vargo. There was no question that their marriage had been troubled for many years; however, the trial court's finding that there was no intact family and no marriage to preserve was supported by some but not all of the evidence. In such a fact-driven matter, where there is evidence of record for the trial court's finding, as well as evidence for the contrary position, it would be entirely inappropriate for this Court to substitute its judgment for that of the fact-finder, who saw the witnesses and heard first-hand their testimony. *See E.W.*, 916 A.2d at 1202 (reminding the litigants that even when contradictory testimony is heard, the trial court is entitled to weigh the evidence and assess the witnesses' credibility).

The difficulty in determining the status of the Vargo marriage—and the enormous ramifications of that factual determination for the parties as well as for the young children involved in this case—prompt us to add our voice to earlier calls for modification of Pennsylvania law to permit DNA testing as an alternate avenue for rebutting the presumption of paternity. *See Strauser, supra* at 94–97, 726 A.2d at 1057–58 (Newman, J., dissenting); *Brinkley, supra* at 258–67, 701 A.2d at 185–89 (Newman, J., dissenting). As re-

¶ 22 Turning to the doctrine of paternity by estoppel, we review first the

quired by Pennsylvania law, we have decided this case without taking into account the results of DNA testing of Appellant, Mother, and the two children, which was done by consent. However, in our view, Pennsylvania law is outdated on the issue of DNA evidence in paternity disputes, and should be modified to acknowledge the scientific reality that, in virtually all cases, it is now possible to establish to nearly absolute certainty whether a putative father is indeed the biological father of a child. Pennsylvania law at present requires courts to ignore this reality, unless the court first concludes that the presumption of paternity does not apply or has been rebutted via the traditional proofs of sterility/impotence or non-access.

Thus, in a case such as the one *sub judice*, a legal determination of paternity may rest on a judicial evaluation of whether the mother's marriage is irretrievably broken or, alternatively, is merely very troubled, but remains in some sense intact. The difficulty in drawing such a distinction regarding one of the most intimate of human relationships needs no elaboration. Nonetheless, if the trial court concludes that the marriage falls into the former category, the presumption of paternity would not apply, but if the trial court concludes that the marriage falls into the latter category, the presumption of paternity *would* apply. In our view, such a legal analysis not only invites inconsistency, but is also illogical and blind to modern social and scientific realities. In a case such as the one *sub judice*, it defies reason and logic to preclude the admission of DNA evidence to rebut the presumption of paternity.

Furthermore, the inability to acknowledge in a legal sense what everyone appears to accept as a biological fact—that Appellant is the biological father of the girls involved in the instant case—has complicated and lengthened the resolution of this matter to no sensible end. The trial judge, the Honorable David N. Wecht, has urged the appellate courts of this Commonwealth to revisit the doctrines of presumption of paternity and paternity by estoppel in light of the availability of accurate and precise DNA testing, and we strongly concur in his sentiments. *See Vargo v. Schwartz*, 81 Pa. D. & C.4th 1, 13 n. 7 (Pa.Com.Pl.2007). Justice Newman has argued, in dissent and to little or no avail, that the legislature has *already* revisited the traditional doctrine of the presumption of paternity. Specifically, Justice Newman, joined in dissent by Justice Castille, has discerned a conflict between the

presumption of paternity as the doctrine is currently applied in Pennsylvania and the following two subsections of the Uniform Act on Blood Tests to Determine Paternity (the "Act"). *See Strauser, supra,* at 96, 726 A.2d at 1058 (Newman, J., dissent) (discussing 23 Pa. C.S.A. § 5104(c) and (g)).

(c) **Authority for test.**—In any matter subject to this section in which paternity, parentage or identity of a child is a relevant fact, the court, upon its own initiative or upon suggestion made by or on behalf of any person whose blood is involved, may or, upon motion of any party to the action made at a time so as not to delay the proceedings unduly, shall order the mother, child and alleged father to submit to blood tests. If any party refuses to submit to the tests, the court may resolve the question of paternity, parentage or identity of a child against the party or enforce its order if the rights of others and the interests of justice so require.

\* \* \* \*

(g) **Effect on presumption of legitimacy.**— The presumption of legitimacy of a child born during wedlock is overcome if the court finds that the conclusions of all the experts as disclosed by the evidence based upon the tests show that the husband is not the father of the child.

23 Pa.C.S.A. § 5104. (We note that in *John M. v. Paula T.*, 524 Pa. 306, 312 n. 2, 571 A.2d 1380, 1384 n. 2 (1990), our Supreme Court rejected use of the term "presumption of legitimacy" in favor of "presumption of paternity." *See Brinkley, supra* at 258 n. 4, 701 A.2d at 185 n. 4.)

In Justice Newman's view, the above provisions "expressly provide[ ] that a court may compel interested parties to submit to blood testing, and that such blood testing can rebut the presumption of paternity." *See Strauser, supra* at 96, 726 A.2d at 1058 (Newman, J., dissent); *see also Brinkley, supra* at 263, 701 A.2d at 187 (Newman, J., dissent) ("The courts' threshold requirement of common law proof (of sterility/impotence or non-access) to rebut the presumption is clearly erroneous pursuant to the Act, which explicitly provides that blood tests are an alternative method of rebutting the presumption.").

However, Justice Newman's interpretation of the statute has not garnered a majority of our Supreme Court, and the apparent tension as perceived by Justice Newman persists. *See Strauser, supra* at 91 n. 2, 726 A.2d at 1056 n. 2.

trial court's rationale for not applying this doctrine in the instant case and the evidence of record that supports the trial court's decision. Most significantly, the trial court found that Mother and Appellant had perpetrated fraud as to the true identity of the girls' father, and when Mr. Vargo learned that he was not the biological father, he ceased to hold out the girls as his own children. Mr. Vargo believed the two girls were his children for, respectively, 21 months and 5 months after their births because of Mother's misrepresentations, which were encouraged by Appellant. Mother admitted that she had known since conception that her husband was not the girls' father, but she did not inform her husband of this fact until October 2003, at which time the couple separated. (N.T., 9/24/04, at 11, 32). Mother also gave undisputed testimony that Appellant had offered her $30,000 to "walk out of [Appellant's] life" and that Appellant had offered to help her support the girls, on his terms, if she did not seek redress in court. (*Id.* at 52). The evidence was undisputed that when Mother was finally honest with Mr. Vargo, he "told everyone" that he was not the girls' father. (*Id.* at 29).

¶ 23 Despite the deceit and misrepresentation perpetrated on Mr. Vargo, Appellant asks us to hold that Mr. Vargo is the girls' legal father under the doctrine of paternity by estoppel, thereby relieving Appellant of any legal responsibility that he might have toward the children. We decline to do so, not least because application of paternity by estoppel in this instance would punish the party that sought to do the right thing and reward the party that perpetrated a fraud. *See N.C., supra* at 504; *Gebler v. Gatti*, 895 A.2d 1, 2 (Pa.Super.2006); *Kohler v. Bleem*, 439 Pa.Super. 385, 654 A.2d 569, 575–76 (1995). Furthermore, the public policy behind estoppel focuses on the child: "children should be secure in knowing who their parents are [and] ... should not be required to suffer the potentially damaging trauma that may come from being told that the father [she] has known all [her] life is not in fact [her biological] father." *Fish, supra* at 530, 741 A.2d at 724 (citation omitted). Mother testified that she would not lie to the children about their biological father, and that the older girl already "know[s] of [Appellant]." (N.T., 9/24/04, at 91). Thus, there was undisputed evidence that application of the doctrine of paternity by estoppel in this case, along with presenting serious issues of fairness, would not even accomplish the relevant public policy goals.

¶ 24 For his argument in favor of the application of estoppel, Appellant places great weight on the facts that the girls' birth certificates bear Mr. Vargo's name as "Father," that the girls received health insurance through Mr. Vargo, and that Mr. Vargo supported and cared for the girls. However, Appellant seemingly ignores the deceit and misrepresentation that caused Mr. Vargo to take these actions, in the belief that he had fathered the children and thus bore responsibility for their needs and welfare.

¶ 25 In addition, Appellant argues that estoppel should be applied because Mr. Vargo has continued to support Mother and the children economically and to provide care and nurturing for the children, even after learning that he is not the biological father. As the trial court points out, Mr. Vargo explained that he has maintained the girls on his health insurance policy to ensure that they receive medical care in the event of illness. *See Vargo v. Schwartz*, 81 Pa. D. & C.4th 1, 11 (Pa.Com. Pl.2007); N.T., 9/24/04, at 81. Further, Mr. Vargo testified that the children were "two little girls that had nothing to do with this." (N.T., 9/24/04, at 80). His testimo-

ny makes clear that he has tried to act responsibly toward these young children, even after learning that he was not their biological father, to spare them at least some of the repercussions of the circumstances of their conception. We do not read our law to require acts that place children at risk or in need of life's basic necessities in order to reinforce the legal point that one is not financially responsible for those children. The trial court placed greater weight on Mr. Vargo's public disavowal of his biological paternity than on his more private interactions with the two young girls who, given their tender years, were no doubt incapable of comprehending the controversy swirling around them. We cannot conclude that the trial court abused its discretion in doing so. Under these circumstances, we conclude that the trial court did not abuse its discretion in holding that paternity by estoppel was not applicable. Accordingly, we also conclude that Appellant's second issue has no merit.

¶ 26 In Appellant's third issue, he contends that Mother made certain prior "judicial admissions" which established that Mr. Vargo was the children's father and which should therefore have precluded the trial court from taking evidence to the contrary at the paternity hearing. (See Appellant's Brief at 24–25). Specifically, Appellant cites the following three examples of Mother's judicial filings and testimony which allegedly indicate her admission that Mr. Vargo was her daughters' father. First, Mother filed a complaint for support for the children on October 5, 2003, in which she named Mr. Vargo as the father of the girls. Second, Mother filed a protection from abuse petition in December 2003, in which she also listed Mr. Vargo as the father of the girls. Third, Appellant contends that Mother's testimony of September 14, 2004, during the hearing regarding J.J., her son with Mr. Johnston, constitutes an admission that her marriage to Mr. Vargo was intact. Appellant insists that the trial court was bound by all these "judicial admissions" and therefore was required to find that Mr. Vargo was the legal father of the children. However, Appellant provides no citation to controlling law to support his contention that the trial court was bound in the instant case by Mother's pleadings and testimony in different matters.[7]

¶ 27 Our Supreme Court has held that "[a]s a general rule, a party to an action is estopped from assuming a position inconsistent with his or her assertion in a previous action, if his or her contention was successfully maintained." *In re Adoption of S.A.J.*, 575 Pa. 624, 631, 838 A.2d 616, 620 (2003) (citation omitted). Accordingly, judicial estoppel is properly applied only if the court concludes the following: (1) that the appellant assumed an inconsistent position in an earlier action; *and* (2) that the appellant's contention was "successfully maintained" in that action. *Id.* at 632, 838 A.2d at 621.[8]

¶ 28 In the instant case, Mother voluntary withdrew her complaint against Mr. Vargo for support of her daughters, acknowledging that he was not their biological father. Hence, Mother's original contention that her husband was the girls'

---

7. In fact, in the case cited by Appellant, *Gibbs v. Herman*, 714 A.2d 432 (Pa.Super.1998), this Court reiterated that judicial admissions are "conclusive in their nature insofar as *their effect is confined to the case in which they are filed.*" *Id.* at 437 (citations omitted) (emphasis added).

8. Our Supreme Court has not definitively established whether the second element (successful maintenance) is strictly necessary to implicate judicial estoppel or is merely a factor favoring the application. *See S.A.J., supra* at 631 n. 3, 838 A.2d at 620 n. 3.

biological father was not "successfully maintained" in the earlier support action, and therefore judicial estoppel does not apply.

¶ 29 With regard to Mother's allegedly contradictory testimony of September 14, 2004, during the *Vargo v. Johnston* hearing, the trial court admitted the transcript of this prior hearing as evidence and weighed it along with the other testimony presented at the September 24, 2004, hearing in the instant matter. Contrary to Appellant's view, the trial court did not find Mother's earlier testimony directly contradictory to her later testimony, but rather determined that the "record evidence developed at the September 14 and 24, 2004 hearings did not paint a picture of an intact family or a marriage that could be preserved." *Vargo v. Schwartz,* 81 Pa. D. & C.4th 1, 10 (Pa.Com.Pl.2007). Based on our careful review of the record, we conclude that there is evidence to support the trial court's findings, and thus we must also conclude that the trial court did not abuse its discretion; Appellant's third issue thus has no merit.

¶ 30 In Appellant's fourth issue, he contends that the trial court erred by failing "to assign any significance to Mother's voluntary dismissal of the child support complaint filed against her husband [Mr. Vargo]." (Appellant's Brief at 26). Although Appellant's argument is poorly developed and hence not entirely clear, it appears to be a challenge to the weight that the trial court gave to Mother's decision to withdraw her claim against Mr. Vargo for support for her daughters. As we have explained, the trial court has the authority—and indeed the responsibility—to weigh the evidence presented. *See Smith,* 904 A.2d at 20. As an appellate court, we do not reweigh the evidence, and we do not substitute our judgment for that of the trial court. Appellant's fourth issue is meritless.

¶ 31 In Appellant's fifth and final issue, he contends that the trial judge erred by not recusing himself from this matter. Specifically, Appellant alleges that the trial judge was biased in favor of the evidentiary value of DNA testing and improperly considered the results of such testing when deciding the current matter. No relief is warranted.

¶ 32 In reviewing the denial of a motion to recuse, our standard is abuse of discretion. *In re In the Interest of S.H.,* 879 A.2d 802, 808 (Pa.Super.2005), *appeal denied,* 586 Pa. 751, 892 A.2d 824 (2005). Recognizing that our judges are honorable, fair and competent, we extend extreme deference to a trial court's decision not to recuse. *Id.* "It is the burden of the party requesting recusal to produce evidence establishing bias, prejudice or unfairness which raises a substantial doubt as to the jurist's ability to preside impartially...." *Id.* (citation omitted).

¶ 33 Appellant's primary "evidence" of the trial judge's alleged favorable bias toward genetic testing consists of a footnote in the trial court's opinion in which a brief argument is presented for a change in the law of paternity. (*See Vargo v. Schwartz,* 81 Pa. D. & C.4th 1, 13 n. 7 (Pa.Com.Pl. 2007)). In this footnote, the trial judge opined that the presumption of paternity and the doctrine of paternity by estoppel may have outlived their usefulness in an age when family relations have changed and DNA testing can promptly provide accurate paternity determinations. (*See id.*). In thusly expressing his opinion concerning an area of law that has been slowly evolving to accommodate scientific advances and social change, the trial judge did not in any way act outside the bounds of propriety.

**472**

¶ 34 The text of the trial court's opinion makes clear that the trial judge correctly understood and applied the presumption of paternity and the doctrine of paternity by estoppel—as those bodies of Commonwealth law exist *at the present time. (See id.).* The trial judge provided a reasoned analysis for his resolution of the case, based on the prevailing law of paternity. That the trial judge may disagree with certain aspects of prevailing law does not diminish his ability to apply the law properly and fairly, without bias.

¶ 35 Furthermore, nothing in the record suggests that the trial court based its decision on the DNA test results that identified Appellant as the children's father. The test results were included in the certified record, but the trial court's knowledge of those results certainly does not establish that they were used improperly. As discussed above, the trial court's reasoned opinion makes clear that the court's decision was based on prevailing law—not on DNA testing results. Appellant's allegations of judicial bias are thoroughly meritless.

¶ 36 In summary, after comprehensive review of the facts of this case in light of prevailing law and keeping in mind our limited standard of review, we conclude that none of Appellant's issues have any merit. Accordingly, we affirm the holding of the trial court.

¶ 37 Order affirmed.