J-A23013-14

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | | |
|---|---|---|
| D.S., | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| S.S. | : | |
| | : | |
| Appellee | : | No. 2037 WDA 2013 |

Appeal from the Order entered December 4, 2013,
Court of Common Pleas, Allegheny County,
Civil Division at No(s): FD-96-02467-008 – PACSES Case No. 632003256

BEFORE:  DONOHUE, ALLEN and MUSMANNO, JJ.

MEMORANDUM BY DONOHUE, J.:                    **FILED AUGUST 22, 2014**

D.S. ("Father") appeals from the December 4, 2013 order entered by the Allegheny County Court of Common Pleas denying his motion to modify his child support payments owed to S.S. ("Mother") for minors, D.S. ("Son") and A.S. ("Daughter") (collectively, "Children"), cancel all arrearages owed, and refusing his request for genetic testing, based upon a finding of paternity by estoppel.  After careful review, we affirm.

The trial court aptly summarized the facts of the case as follows:

> [Father] and [Mother] were involved in an intimate relationship in 1996.  In that year, Mother gave birth to [][S]on and petitioned for child support against Father.  On August 5, 1996, Father signed an [a]cknowledgment of [p]aternity for [Son] and consented to a child support order.  Three years later, in 1999, Mother gave birth to [] [D]aughter and named Father as the father of that child as well.  Again, Father signed an acknowledgement of paternity.  Mother and Father never married and he

characterizes their relationship in his testimony as 'ad hoc.' At some point, Mother and Father's intimate relationship ended. Mother and [] [C]hildren live in North Carolina. Father lives in Pittsburgh but works for an airline in Atlanta, Georgia and is able to see [] [C]hildren twice a month.

For the last 17 years, Father has maintained an on-going parental relationship with both children, seeing them twice a month, exercising custody, and taking them on many vacations. Father testified he had acted in the role of father: 'Since day one. Since they were born.' There was no testimony regarding any other father figure.[FN]

In June of 2012, Father took both children on a beach vacation. While there, he took a picture of the children on the beach. That picture made him realize that [] [C]hildren did not really look like him and he began to question whether they were his children. Father decided to purchase DNA tests and informed [] [C]hildren that he was testing their DNA to determine if he was their father. The results demonstrated unequivocally that he was not the father of either child. He opened the tests and shared the results with [] [C]hildren, causing them both great distress.

After discovering that the children were not his biological children, he continued to exercise custody, visit with them, and take them on vacation. He also continued to pay child support for them for a full year. Furthermore, Father testified he intends to 'continue seeing the kids... Try to keep them on track.' He testified he wishes to remain in their lives.

On August 14, 2013, Father filed a petition for genetic testing and to modify his child support. A hearing was held on August 28, 2013 […] and Father's requests were denied by the Hearing Officer who found it was in the best interest of [] [C]hildren

that the doctrine of Paternity by Estoppel be applied. Father timely filed exceptions, which [the trial court] denied on December 4, 2013.  This appeal followed.

_____
[FN]  Mother did not attend the hearing and was not subpoenaed by Father to do so.

Trial Court Opinion, 2/21/14, at 1-3 (record citations omitted) (footnote in the original).

Father filed a timely notice of appeal.  He raises one issue for our review:

> Whether the trial court erred as a matter of law and abused its discretion when it misapplied or overrode the law in failing to find that a fraud occurred based on the facts of the case, the evidence submitted in this case, the testimony of [Father] elicited in the case and the established record of the case in thereby estopping [Father] from obtaining a [c]ourt ordered genetic test?

Father's Brief at 7.

We review a child support order, including matters involving a question of paternity, for an abuse of discretion.  *Vargo v. Schwartz*, 940 A.2d 459, 462 (Pa. Super. 2007).  "An abuse of discretion exists if the trial court has overridden or misapplied the law, or if there is insufficient evidence to sustain the order."  *Id.* (citation omitted).  The trial court is responsible for making factual determinations, and we will not disturb its findings if the record supports them, regardless of whether we would have made a different decision based on the evidence presented.  *Id.*  It is also the role of the trial court to weigh the evidence presented and to make credibility

determinations. *Id.* "In so doing, the finder of fact is free to believe all, part, or none of the evidence and we as an appellate court will not disturb the credibility determinations of the court below." *Id.* (citation, formatting and quotations omitted).

Applying the doctrine of paternity by estoppel, the trial court found that although Father had proof that he was not Children's biological father, he was nonetheless still legally their father, as this was in Children's best interests.[1] Trial Court Opinion, 2/21/14, at 3, 6-7. The trial court based its finding on the fact that Father held himself out as Children's father since the time of their births; continued to pay child support and behave as their father after learning he was not in fact their father; and failed to provide sufficient evidence that he was induced to accept paternity by Mother's fraud. *Id.* at 3-4, 5. It therefore required him to continue to pay child support and denied his request for a DNA test through the courts.

Father asserts that the application of the doctrine of paternity by estoppel in this case was error, as the evidence of record supports a finding that Mother fraudulently induced him to accept paternity; once Father learned that he was not Children's father he took steps to "gently remove

_____

[1] We note that Mother and Father were never married, and thus there was no cause to determine whether the presumption of paternity applied in this case. *See* N.T., 8/28/13, at 6. "The policy underlying the presumption of paternity is the preservation of marriages. The presumption only applies in cases where that policy would be advanced by the application; otherwise, it does not apply." *Fish v. Behers*, 741 A.2d 721, 723 (Pa. 1999).

himself" from their lives; Children are already aware that Father is not their father and thus there is no support for finding that it is in Children's best interests to apply the doctrine. Father's Brief at 15-29.

We begin with some background information on the doctrine of paternity by estoppel.

> Estoppel in paternity actions is a legal determination based on the conduct of the mother and/or the putative father with regard to the child, *e.g.,* holding out the child to the community as [their child] and/or supporting the child. If the evidence is sufficient, estoppel may bar either a putative father from denying paternity or a mother from succeeding in a claim of paternity against a third party. Estoppel rests on the principle that a person may not challenge his role as a parent once he has accepted it, even with contrary DNA and blood tests.

*Vargo*, 940 A.2d at 464 (internal citations and quotation omitted). "[T]he doctrine of estoppel in paternity actions is aimed at achieving fairness as between the parents by holding them, both mother and father, to their prior conduct regarding the paternity of the child." *Doran v. Doran*, 820 A.2d 1279, 1283 (Pa. Super. 2003) (citation and quotation omitted).

> Estoppel is based on the public policy that children should be secure in knowing who their parents are. If a certain person has acted as the parent and bonded with the child, the child should not be required to suffer the potentially damaging trauma that may come from being told that the father he has known all his life is not in fact his father.

*J.C. v. J.S.*, 826 A.2d 1, 4 (Pa. Super. 2003) (citation omitted).

Evidence of fraud or misrepresentation with regard to issues of paternity is relevant to the application of estoppel and must be considered by the trial court. In some situations, fraud can preclude the application of paternity by estoppel. Particularly where fraud or misrepresentation is involved, courts applying the doctrine of paternity by estoppel have taken care to consider evidence of the [putative father's] conduct toward the child not only **before** the husband learned that he was not the child's biological father, but also **after** becoming aware of his non-parentage.

*Vargo*, 940 A.2d at 464 (internal citations omitted) (emphasis in the original). To rescind an acknowledgement of paternity based on fraud, the father must establish the fraud by clear and convincing evidence. 23 Pa.C.S.A. § 5103(g)(2). "The test for fraud is: (1) a misrepresentation, (2) a fraudulent utterance, (3) an intention by the maker that the recipient will thereby [be] induced to act, (4) justifiable reliance by the recipient upon the misrepresentation, and (5) damage to the recipient as a proximate result." *Doran*, 820 A.2d at 1284.

Absent any overriding equities in favor of the putative father, such as fraud, the law cannot permit a party to renounce even an assumed duty of parentage when by doing so, the innocent child would be victimized. Relying upon the representation of the parental relationship, a child naturally and normally extends his love and affection to the putative parent. The representation of parentage inevitably obscures the identity and whereabouts of the natural father, so that the child will be denied the love, affection and support of the natural father. As time wears on, the fiction of parentage reduces the likelihood that the child will ever have the opportunity of knowing or receiving the love of his

natural father. While the law cannot prohibit the putative father from informing the child of their true relationship, it can prohibit him from employing the sanctions of the law to avoid the obligations which their assumed relationship would otherwise impose.

\* \* \*

[T]he determination of paternity by estoppel should be better informed according to the actual best interests of the child, rather than by rote pronouncements grounded merely on the longevity of abstractly portrayed (and perhaps largely ostensible) parental relationships.

**K.E.M. v. P.C.S.**, 38 A.3d 798, 807-08, 809 (Pa. 2012) (citation omitted).

Father first argues that the trial court erroneously failed to find that fraud precluded the application of paternity by estoppel in this case. Father's Brief at 15-20. He asserts that **Doran v. Doran** is controlling precedent. **Id.** at 16-20.

In **Doran**, the mother, unbeknownst to her husband, had an extramarital affair. The affair resulted in the conception of a child, but believing the child was his, the husband raised and supported the child. Although their marriage ended in divorce, the now ex-husband paid child support and exercised periods of custody with the child. **Doran**, 820 A.2d at 1281.

When the child was approximately six years old, the mother's ex-paramour and the child's biological father, stopped by the ex-husband's house. This prompted the ex-husband to ask the mother whether the child was the ex-husband's child, and the mother assured him that the child was.

Approximately five years later, however, the ex-husband became suspicious that he was not the child's father based upon the child's appearance as he got older. The results of a DNA test confirmed that the ex-husband was not the child's father. Thereafter, the ex-husband, "as gently as possible[,] removed himself from the child's life in a way which he felt would cause the child the least amount of anguish and hurt." *Id.*

The trial court found, and this Court affirmed, that the doctrine of paternity by estoppel was inapplicable because of Mother's fraud. Specifically, we concluded that the record supported the following finding of the trial court:

> Mr. Doran had been operating for more than a decade under the misrepresentation that he was, indeed, the child's father. This subterfuge was a direct result of the mother's intentional misstatements and deceptions to him. She deluded herself by refusing to even consider that her child might be fathered by the man with whom she had an illicit affair. She never once mentioned her meretricious relationship with this third party to her husband. Instead, she fallaciously led him to believe, at the same time she was seeking child support from him, that he was, in fact, the child's father. Had she been forthright to her spouse and explained what she had done at the time of the child's conception, her husband may certainly have acted differently. Unfortunately, her deceit, falsehoods and misrepresentations gave Mr. Doran no reason but to treat the child as his own – with love, care and respect, as only a decent human being would do under the circumstances.

*Id.* at 1284.

Contrary to Father's contention, the record in the case at bar bears little resemblance to that of the **Doran** case. Here, Mother was not present for the hearing; Father was the only testifying witness. He presented no evidence that he believed he and Mother were in an exclusive relationship at the time of either child's conception, that he was unaware that she was having sex with another man or other men at that time, or that he had no reason to doubt that he was the father of Children. Moreover, there is absolutely no support for Father's claim that like the ex-husband in **Doran**, he "took steps to gently remove himself from the children's lives after he learned that he was not their biological father." Father's Brief at 24. To the contrary, and as discussed in greater detail *infra*, the record reflects that after receiving the results of the private DNA test, Father continued to behave as if he was Children's biological father. **See** N.T., 8/28/13, at 9, 13, 14, 16.

This case more closely resembles the case of **J.C. v. J.S.** In that case, the mother had an extramarital affair that her husband discovered approximately six months before the birth of what the husband believed was their first child. The parties reconciled and subsequently had a second child. The parties divorced and the now-ex-husband began paying child support for the two children. Approximately a year later, when the oldest child was six years old, the mother informed her ex-husband that he was not the oldest child's father. Nonetheless, the ex-husband continued to treat the child as

his own, enjoying regular periods of custody with him and supporting him financially. *J.C.*, 826 A.2d at 2-3.

Approximately four years after he learned he was not the child's father, the ex-husband filed a petition for a DNA test, which the court denied. Thereafter, he filed a petition to modify his support obligation to relieve him of paying child support for the oldest child, which the court also denied. On appeal from the latter order, we affirmed, finding that because the ex-husband continued to act as the child's father after learning he was not the father, it precluded a finding of fraud, and that application of the doctrine of paternity by estoppel was proper. *Id.* at 4.

The record in the case before us reflects that upon learning that he was not the biological father of Children, Father continued to act as their father and do for them as he had done prior to receiving the DNA test results. He attended meetings related to Children's education (N.T., 8/28/13, at 9); he paid child support (*id.* at 13); he did not make any attempt to obtain the court's permission to discontinue child support payments for over a year following the DNA test results (*see id.* at 15); he bought Children clothing and paid for their cellphones (*id.* at 14); and he took them on multiple vacations and continued to have custodial time with Children (*id.* at 16). Indeed, at the hearing, he testified that in spite of his awareness that he is not Children's father, he wants to remain involved in

Children's lives and had started a bank account for them, but wanted to serve as a "male role model" instead of as their father. *Id.* at 20.

As stated by the trial court, the only "evidence" of fraud he presented was: "Mother named him as [Children's] father and [] the DNA test shows he is not[.]" Trial Court Opinion, 2/21/14, at 4; *see generally*, N.T., 8/28/13, at 5-21. Viewing the record of the case, including evidence of Father's conduct after becoming aware that he was not Children's Father as our case law instructs, we find no abuse of discretion in the trial court's finding that Father failed to present clear and convincing evidence to prove that Mother induced him to accept paternity of Children through fraud. *See* *Vargo*, 940 A.2d at 464; *Doran*, 820 A.2d at 1284; 23 Pa.C.S.A. § 5103(g)(2). As such, this argument fails.

We are likewise unconvinced that the mere fact that Children are aware that Father is not their biological father precludes application of the doctrine of paternity by estoppel. *See* Father's Brief at 20-24. According to Father, Children "have suffered the damaging trauma that the doctrine of paternity by estoppel was meant to prevent. The legal fiction no longer exists based on the facts of this case." *Id.* at 22-23. However, simply because Children know that Father is not in fact their father does not preclude the application of paternity by estoppel, especially since Father is

the one that destroyed the fiction.[2]  As quoted hereinabove, "[w]hile the law cannot prohibit the putative father from informing the child of their true relationship, it can prohibit him from employing the sanctions of the law to avoid the obligations which their assumed relationship would otherwise impose."  *K.E.M.*, 38 A.3d at 808 (quoting *Commonwealth ex rel. Gonzalez v. Andreas*, 369 A.2d 416, 419 (Pa. Super. 1976) (*en banc*)). Furthermore, in *Doran*, a case in which the mother told the child that her ex-husband was not the child's biological father, this Court stated that in the absence of a finding of fraud, the doctrine of paternity by estoppel would have been applicable.  *See Doran*, 820 A.2d at 1281, 1283.

Father continues by stating that instead, "[i]t is in the best interest of [] [C]hildren to allow them the freedom to interact with [Father] outside the scope and strictures of a child support system in an independent manner without the punitive actions of jail time, significant interest and arrearage penalties and wage garnishment."  *Id.* at 23-24.  However, this is a statement of what is in Father's best interest, not Children's best interests.

The record unequivocally supports a finding that applying the doctrine of paternity by estoppel is in Children's best interests.  Father financially supports Children by providing both court-mandated payments and additional funding.  N.T., 8/28/13, at 13, 14.  He has been Children's father

---

[2]  Were we to conclude otherwise, the doctrine of paternity by estoppel would become obsolete, as a parent could avoid its application simply by telling the children that the person they thought was their father is not.

since their births and is actively involved in Children's lives – attending meetings related to their education, taking them on vacation, and spending time with them. *Id.* at 5, 9, 15-16. Based upon Father's testimony regarding Children's reaction to learning that Father is not their father, it is clear that Children have a close relationship with him – Daughter cried and took the news "very hard" and Son was "numb." *Id.* at 20. Notably, when Father was asked how Children's best interests would be served by a finding that Father was ***not*** their legal father, his only response was, "Because biologically, I am not their legal father." *Id.* at 19. Moreover, Father, too wishes to continue the relationship with Children, including exercising visitation and providing financial support. *Id.* at 21

A finding that Father is legally Children's father greatly inures to Children's benefit. *Cf. K.E.M.*, 38 A.3d at 809 ("The legal determination of parentage is a hollow one where the accoutrements do not inure to a child's benefit."). The stability attendant to their continued financial support through Father's legal obligation is obvious. Therefore, based upon our review of the record and the applicable law, we find no abuse of discretion in the conclusion that applying the doctrine of paternity by estoppel is in Children's best interests.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/22/2014