J-A17044-14
J-A17045-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| J.J. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| M.C. AND D.T. | |
| Appeal of M.C. | No. 412 EDA 2014 |

Appeal from the Order January 27, 2014
In the Court of Common Pleas of Delaware County
Civil Division at No(s): 12-09900

| | |
|---|---|
| J.J. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| M.C. AND D.T. | |
| Appeal of D.T. | No. 416 EDA 2014 |

Appeal from the Order January 27, 2014
In the Court of Common Pleas of Delaware County
Civil Division at No(s): 12-0990

BEFORE:  GANTMAN, P.J., PANELLA, J., and STABILE, J.

MEMORANDUM BY PANELLA, J.                    **FILED JANUARY 09, 2015**

In these consolidated appeals,[1] we consider whether the circumstances

of an extramarital affair are sufficient to find that an existing marriage is not

---

[1] We consolidated these appeals *sua sponte*.

an "intact marriage" for purposes of the longstanding common law presumption of paternity. The trial court, the Honorable Barry C. Dozor, Court of Common Pleas of Delaware County, concluded that the presumption is inapplicable as there was no intact marriage at the time of the challenge to husband's paternity. Finding no abuse of discretion, we affirm.

For ease of reading, M.C. is the wife; D.T. is the husband; and J.J. is the paramour. M.C. and D.T. are legally married and have been since June 21, 2007. P.T. was born September, 2012, and D.T. is listed as the father on the birth certificate. Prior to P.T.'s birth, M.C. engaged in a prolonged extramarital affair with J.J.

M.C. and J.J. began communicating online in June 2011. In July, the pair started a physical affair. She informed him that she was separated from her husband. That summer the couple vacationed together along with his family and she told them that the two of them were dating. The relationship continued and she even, on occasion, spent the night at the home of J.J.'s mother, leaving for work from there in the morning. M.C. introduced J.J. to her family and friends. As of Labor Day 2011, M.C. informed J.J. that she was pregnant. She never informed her husband of the pregnancy. J.J. held himself out to their friends and family as the father.

That September the couple leased an apartment together where she spent three to four nights per week. In October, M.C. miscarried. At that time, she did not tell J.J. of the miscarriage. She then became pregnant

again. At the time of her conception, she was having sex with both J.J. and D.T. Both men knew about this pregnancy, but not of each other.

By late winter or early spring of 2012, M.C. informed J.J.'s family that she was separated from her husband. In March 2012, M.C. told J.J. that her divorce was finalized. J.J.'s family held a baby shower for her. So did D.T.'s family. In April, M.C. and J.J. had sex in her marital home. The plan was for J.J. to move into M.C.'s home and the couple ended their lease on the apartment in May. M.C. spent Mother's Day with J.J. Also in May, J.J. called D.T. and asked what the status of his relationship was with M.C. D.T. told J.J. that they were still married and expecting a child.

In June, J.J. learned, in a motel room, about the miscarriage, but M.C. still claimed to be divorced and assured him the child was his. J.J. attended OB/GYN appointments. When P.T. was born September, 2012, J.J. and his family arrived at the hospital, but were denied access to the child.

D.T. testified that he did not see his wife often because she had a demanding job (M.C. is a registered nurse), friends, and familial obligations, but that the couple usually spent time together during holidays. M.C. did not tell him about the miscarriage until January 2013. Both M.C. and D.T. maintained that the marriage is intact.

After M.C.'s refusal to permit J.J. contact with the child, his counsel sent a certified letter to M.C., shortly thereafter demanding contact with the child. Denied contact with the child, J.J. filed a complaint to establish

paternity on December 6, 2012. In preparation for a pretrial conference, M.C. filed a petition to strike any references to a paternity test previously obtained by J.J. and M.C. D.T. filed a petition to intervene. M.C. and D.T. filed preliminary objections asserting that J.J. failed to state a claim for relief in light of the presumption of paternity. The trial court granted M.C.'s motion to strike the paternity test from the record and granted D.T.'s petition to intervene. The trial court conducted a two-day hearing. On January 27, 2014, the trial court overruled the preliminary objections and granted J.J.'s request for genetic testing. M.C. and D.T. timely filed their notices of appeal and M.C. moved to stay the order pending the outcome of this appeal.

On appeal, M.C. and D.T. argue that the trial court erred in refusing to apply the presumption of paternity. We disagree.

That a child conceived or born during a marriage is presumed to be a child of the marriage "is one of the strongest presumptions of the law of Pennsylvania." **CW v. LV**, 788 A.2d 1002, 1005 (Pa. Super. 2001) (citation omitted). **See also Strauser v. Stahr**, 726 A.2d 1052, 1053-1054 (Pa. 1999). The preservation of marriages is the purpose of the presumption of paternity. **See Fish v. Behers**, 741 A.2d 721, 723 (Pa. 1999). The presumption renders blood test results irrelevant unless and until the presumption is overcome. **See Strauser**, 726 A.2d at 1054. "[T]he presumption is irrebuttable when a third party seeks to assert his own paternity as against the husband in an intact marriage." **CW**, 788 A.2d at

1005 (citation omitted). *See also K.E.M. v. P.C.S.*, 38 A.3d 798, 806-807 (Pa. 2012) ("As to the presumption of paternity, we note only that recent Pennsylvania decisions have relegated it to a substantially more limited role, by narrowing its application to situations in which the underlying policies will be advanced (centrally, where there is an intact marriage to be protected)."); *Strauser*, 726 A.2d at 1054.

The relevant time to examine whether the marriage is intact is at the time of the challenge to a husband's paternity. *See*, *e.g.*, *Strauser*, 726 A.2d at 1054; *Vargo v. Schwartz*, 940 A.2d 459, 463 (Pa. Super. 2007). This is a question for the fact-finder. *See id*., at 467 ("Whether the family is intact and there is a marriage to preserve are questions of fact, which, like all questions of fact, fall squarely within the realm of the fact-finder.").

The disposition of this appeal turns on whether M.C. and D.T. had an intact marriage at the time of the challenge to husband's paternity. We stress that the trial court observed the witnesses in person at the two-day hearing. The trial court methodically reviewed the testimony presented during the two-day hearing, *see* Amended Opinion, 2/25/14, at 1-17, and determined that M.C. and D.T. testified without any credibility. *See id*., at 25.

The trial court found that M.C.'s testimony about having an intact marriage "*at any time* suggested by the defense [i.e., M.C. and D.T.] had no credibility or any plausibility of truth." *Id*. (emphasis added). The trial court

- 5 -

characterized D.T.'s testimony as to whether there was an intact marriage as "doubtful, not reasonable to believe, incomprehensible and beyond the realm of plausibility." *Id*. The trial court found that the marriage at the time of the challenge to husband's paternity (and before that as well) was a sham. The trial court disbelieved the assertions of reconciliation. It was well within the trial court's discretion to make these findings. *See Vargo*. We are bound by the trial court's credibility determinations, which we cannot disturb by simply reading a cold record.

Based on the findings, the presumption of paternity simply has no application in this case—there was no intact marriage. Accordingly, we affirm the orders overruling the preliminary objections and granting the request for genetic testing.

Orders affirmed. Jurisdiction relinquished.

President Judge Gantman joins in the memorandum.

Judge Stabile files a dissenting memorandum.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 1/9/2015

- 6 -