J-S56032-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| V.D.M. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| R.C.G. | : | No. 1117 EDA 2019 |

Appeal from the Order Entered March 19, 2019
In the Court of Common Pleas of Philadelphia County Domestic Relations
at No(s):  OC1392259

BEFORE:  PANELLA, P.J., OLSON, J., and NICHOLS, J.

MEMORANDUM BY NICHOLS, J.:                    **FILED JANUARY 23, 2020**

V.D.M. (Mother) appeals *pro se* from the March 19, 2019 order in the Court of Common Pleas of Philadelphia County that modified the existing custody order with respect to her son, D.X.M. (Child), born in December of 2008.  The order granted the parties shared legal custody, R.C.G. (Father) primary physical custody, and Mother partial physical custody.  In addition, the order dismissed Mother's petitions for contempt and her motion for recusal.  We affirm.

We summarize the relevant facts and procedural history as follows.  A custody order was entered in January of 2014 (the existing order), when Child was five years old and attending parochial school in Philadelphia,

where he lived with Mother and her older son and daughter.[1]  Father resided in Pennsauken, New Jersey, where he has remained throughout the time of the subject proceedings with his wife, R.B.G. (Stepmother).

The existing order granted the parties shared legal custody, Mother primary physical custody, and Father partial physical custody on an alternating two-week basis.  In week one, Father was granted custody from Friday, when he picked Child up after school, until Sunday at 6:00 p.m.  In week two, Father was granted custody from Wednesday, when he picked Child up after school, until Saturday at 12:00 p.m.

The order subject to this appeal arose from cross-petitions for modification of the existing custody order filed by Father on December 23, 2014, and Mother on July 30, 2015, wherein they requested primary physical custody.  Mother also filed a petition for contempt against Father. These petitions were not included in the certified record.  However, the record indicates that Father's request was based on allegations that he will provide stability and structure for Child, particularly with respect to his education.  *See* N.T., 9/21/18, at 25-26.  Mother's request was based on allegations that Child was sexually molested while at Father's home based on the fact that Child "repeatedly gets abrasions and injuries to his rectum

---

[1] Mother relocated within the city limits more than once during the history of the case.

and his private part over [at Father]'s house." *Id.* at 128-29. Mother also alleged that Child gets sick while at Father's house, including, but not limited to, respiratory infections. *Id.* at 38-40, 71.

The trial court held hearings on November 30, 2016, May 17, 2017, October 31, 2017,[2] January 30, 2018, September 21, 2018, January 24, 2019, and March 19, 2019. During the hearing, the trial court consolidated the parties' petitions for modification, contempt,[3] and recusal.[4] Father was represented by counsel during the proceedings. Mother proceeded *pro se* during all but the first and final hearing dates.[5] There were numerous exchanges between the trial court and Mother regarding Mother's proffers of witnesses and documents.

_____

[2] On October 31, 2017, Patricia Brooker, the chief operations officer at the Consortium, where Child had received mental health treatment, appeared with medical records pursuant to Mother's subpoena. However, no testimony was presented on that date due to the trial court granting a continuance requested by Father's counsel.

[3] Prior to the first hearing, Father filed six *pro se* petitions for contempt against Mother. In 2018, Father filed five *pro se* petitions for contempt. In addition to her contempt petition filed in July of 2015, Mother filed three *pro se* petitions for contempt against Father in 2018, and four petitions in 2019.

[4] Father filed a *pro se* motion for recusal on November 3, 2016, and Mother filed motions for recusal on September 6, 2018 and February 25, 2019.

[5] On November 30, 2016, Mother was represented by David Garnes, Esq. On May 17, 2017, Mother appeared at the hearing with Attorney Garnes, but elected to proceed *pro se*, asserting that counsel did not prepare for her case. N.T., 5/17/17, at 5. Mother represented herself at the remaining hearing, except the March 19, 2019, hearing at which time Mother was represented by John Marshall, Esq.

The parties testified on their own behalf, and they presented testimony from multiple witnesses. In addition, the trial court admitted voluminous documentary evidence introduced by the parties in this case.[6] The trial court also interviewed Child *in camera* on November 30, 2016, May 17, 2017, January 30, 2018, January 24, 2019, and March 19, 2019.

On November 30, 2016, Mother, Father, and Stepmother testified.[7] In addition, the trial court admitted, in part, a document from PCA (PCA document) showing that, on October 27, 2015, Mother took Child to the emergency room at CHOP. Thereafter, a General Protective Services (GPS)

_____

[6] In addition to the testimony, the trial court considered numerous documents that it admitted into evidence during the hearing. Those documents included reports from the Philadelphia Children's Alliance (PCA) the Philadelphia County Department of Human Services (DHS), Children's Hospital of Philadelphia (CHOP), St. Christopher's Hospital for Children, Division of Child Protection and Permanency in the State of New Jersey (DCPP), and the Joseph J. Peters Institute (JJPI).

[7] The November 30, 2016 notes of testimony are among items not included as part of the certified record; however, Mother included it as an addendum to her brief on appeal. Because the accuracy of the notes of testimony is not in dispute, we will consider the addendum copy. ***See Commonwealth v. Barnett***, 121 A.3d 534, 544 n.3 (Pa. Super. 2015) (stating, "While this Court generally may only consider facts that have been duly certified in the record, where the accuracy of a document is undisputed and contained in the reproduced record, we may consider it." (citations omitted)). We observe that the notes of testimony from Child's *in camera* interview on November 30, 2016, are included in the certified record before this Court. Additionally, we note that we have reviewed all documents Mother has transmitted to this Court as exhibits and in her reproduced record.

report was filed with the Philadelphia Department of Human Services, which the PCA document quoted as follows:

> [Child] reported he feels safe at both homes. . . . When asked if anyone hurts him physically or sexually[,] [Child] reported, "I think someone is touching my private part." [Child] further described these incidents [happening] when he is [a]sleep[,] and [he] has never seen the person actually in his room. [Child] states it [is] his [d]ad who touches his penis[;] however[, he is] unsure how he knows it is [Father] because he is sleeping. [Child] is unable to give . . . accurate information regarding timeframe of incidents but states it has happened more than once. . . .

N.T., 11/30/16, Ex. 1, at 2. Upon examining Child, the physician at CHOP did not find evidence of physical trauma. *Id.*

In addition, the PCA document set forth the findings of the PCA forensic interviewer, who conducted an interview of Child on November 11, 2015, as follows:

> [Child] said that he was at [Father]'s house [a]sleep[,] and he thinks [Father] touched his private part because [Father] was the only one in the house. [Child] said that he did not see [Father] come in his room. [Child] said that it may not have been [Father] but that someone had keys to [Father]'s house and broke into his room and touched his private part. [Child] said that it felt like someone was hitting his private part on top of his clothes more than one time when [Child] was 5 years old. [Child] said that he did not see anyone hitting his private part. [Child] said that when he was asleep he turned around and felt a stick in his butt hole. [Child] was unable to describe the stick and said he did not see it. [Child] said he was asleep when the stick incident happened.
>
> [Child] was asked if anyone touched his privates when he was awake[,] and [Child] said no. [Child] was asked if anyone made him touch their privates[,] and he said no. [Child] was asked if [Father] ever did anything that [Child] did not like or that [Father] was not supposed to do[,] and [Child] said no. [Child]

denied that anyone did anything with their mouth or made him do anything with his mouth.

*Id.* at 2. Significantly, the PCA document set forth the impressions of the forensic interviewer including, in part, her concerns that Mother coached Child, as follows:

[Mother] provided a video of her asking [Child] questions about being touched inappropriately. In the video it starts with recording the setting then the focus turns downward with neither [Mother] nor [Child] in the camera. Voices were heard[,] but it is unclear if it was [Mother] and [Child]. During the video it appears that a woman is asking [Child] questions about being touched inappropriately and a boy's voice responds and says that someone touched his privates when he was [a]sleep. It is unclear if[,] when the camera was placed down[,] that the woman was coaching or gesturing to the boy voice in the video.

*Id.* at 8.

On November 30, 2016, Child was nearly eight years old and in second grade. During the trial court's *in camera* interview on that date, the trial court did not directly question Child about his allegations of sexual abuse. The trial court elicited from Child that he lives with Mother, his maternal great-grandmother, and his older brother and sister. N.T., 11/30/16, at 11. Child testified that there are three bedrooms in the house, and that he has his own bed. *Id.* at 12-13. He testified that Mother sleeps on the couch, but she sometimes sleeps in his bed with him. *Id.* at 13-14, 30.

Child testified that Father and Stepmother reside in Father's home. *Id.* at 14. He testified that he has his own bed at Father's house, and that no one sleeps in it with him. *Id.* at 14, 30. Child had no complaints about

either household, but he testified that he would like to go to Father's house more "[b]ecause it's fun over at his house." *Id.* at 30.  Child explained, "We go to the park and stuff." *Id.*

By interim order dated November 30, 2016, the trial court slightly increased Father's physical custody to "Wednesdays from after school until Saturday at noon and on the alternating weeks he shall retain custody until Monday morning and return Child directly to school."  Order, 11/30/16.

On May 17, 2017, Father presented the testimony of Levi Lee, a mental health therapist at the Consortium for Children (the Consortium), which provides outpatient mental health services.  Mr. Lee treated Child from May of 2015, until April of 2016.  On inquiry by the trial court, Mr. Lee testified that he conducted "different therapy approaches with [Child]" related to Mother's allegations that Child was sexually abused, and the allegations "kept on coming out unfounded."  N.T., 5/17/17, at 143.  In addition, Mr. Lee testified that he did not observe any symptoms of sexual abuse in Child.  *Id.* at 144.

Mr. Lee testified that Mother became verbally abusive to him, his supervisor, and other staff at the Consortium after he concluded the sexual abuse allegations were unfounded.  *Id.* at 141-42, 153-54.  Mr. Lee testified that Mother caused disruptions in Consortium's office.  *Id.* at 153-54.  On cross-examination by Mother, he explained:

> My own personal experience with you, one time you put your middle finger up at me when you [were] leaving out the door.

You also stuck your tongue [out] at me.  You recorded me . . . unknowingly. . . . You wrote threatening emails to our agency.

*Id.* at 164.

Mother also testified on her own behalf during the May 17, 2017 hearing, and she presented the testimony of Elyse Allen, a caseworker at DCPP.[8]  Ms. Allen testified that, from 2013 to 2015, five separate reports were made to DCPP alleging that Father was a perpetrator against Child for neglect, sexual, and physical abuse.[9]  N.T., 5/17/17, at 13-14.  She testified that all of the reports were unfounded.  *Id.* at 13.

Ms. Allen testified that a sixth and final report was made by Mother in 2016, for which the investigation was not yet complete.  She testified that Mother alleged that Father forced Child to eat potato salad until he vomited.  *Id.* at 15.  Mother alleged that Father then hit Child with a belt on the legs many times.  *Id.*  On cross-examination by Mother, Ms. Allen testified, in effect, that Mother's allegation regarding physical abuse of Child was unsubstantiated.  *Id.* at 24-25.

In addition, Mother alleged that Child always returned home from Father's house with breathing issues because Stepmother smoked and there was mold in Father's home.  *Id.* at 16.  However, Ms. Allen testified that she

_____

[8] Ms. Allen testified by telephone.

[9] Ms. Allen did not specify who made the five reports to DCPP.

visited Father's home and found it "very clean." *Id.* at 18. She testified, "It has no smells that includes cigarettes. [Stepmother] does smoke but she is outside when she does so and the ashtray is outside to show that. And it doesn't smell of cigarettes or mold. It smells fine. . . ." *Id.* Further, Mother repeated the prior allegations regarding sexual abuse, which had been unfounded, and, for that reason, DCPP did not investigate the allegation. *Id.* at 15, 29.

On January 30, 2018, and September 21, 2018, Father testified on his own behalf.[10] On the latter date, the 2018-2019 school year had recently commenced, and Child was in fourth grade. Father testified that Mother unilaterally transferred Child from the parochial school to the public school located in her neighborhood. N.T., 9/21/18, at 32-33. However, Father testified that Child had enjoyed the parochial school and was progressing there. *Id.* at 76. Father testified, Child is "not learning [at the new school]. All he's doing is regurgitating or redoing something that's just easy to him." *Id.* at 79. Father also testified that the public school is a farther driving distance from his home in New Jersey than the parochial school. *Id.* at 33-35.

_____

[10] Mother filed the motion for recusal on September 6, 2018. The trial court denied the motion at the September 21, 2018 hearing.

Mother cross-examined Father at the September 21, 2018 hearing, and she testified on her own behalf. At the conclusion of the September 21, 2018 hearing, the trial court issued an interim order granting the parties shared legal custody, Father primary physical custody, and Mother partial physical custody "two out of every three weekends of the month from Friday, at 4:00 p.m., to Sunday, at 7:00 p.m." In addition, the order directed Father to enroll Child "in his local school in New Jersey." Order, 9/21/18. The order directed that the custody transfers occur at the 6th Police District building in Philadelphia. Finally, at Mother's request, the trial court continued the hearing to allow Mother to produce witnesses. The trial court ordered Mother to produce a witness list as well as offers of proof by October 30, 2018. Mother complied and submitted a forty-two page witness list.

The matter was initially listed for a hearing in March 2019. However, on January 7, 2019, the trial court issued an order to reschedule the hearing for January 24, 2019.

On January 24, 2019, the trial court convened a hearing. At the time of the hearing, Father had exercised primary physical custody for four months pursuant to the September 21, 2018 interim order. Child was ten years old and attending parochial school in New Jersey.

Mother did not appear for the January 24, 2019 hearing, and the trial court contacted Mother by telephone in open court. Mother alleged that she

did not have notice of the hearing. N.T., 1/24/19, at 4-6. Thereafter, the trial court conducted an *in camera* interview of Child.[11] Child testified that he wants to continue living with Father because he has his own bedroom. N.T., 1/24/19, at 4. Child explained, "I don't have my own room at mom's house, and she always sleeps in the bed with me, and . . . she walks around naked." *Id.* at 5. The trial court inquired of Child, as follows:

[Q.] [Y]ou go two out of every three weekends to see [Mother]?

[A.] Yeah.

[Q.] Is that okay?

[A.] No.

*Id.* Child explained that he "missed a couple of [his basketball] games because of my mom. . . . She promised she would take me, but she doesn't." *Id.* at 5-6. The trial court then continued the hearing.

On February 11, 2019, prior to the final hearing date, the trial court ruled on Mother's witness list. The trial court issued a seven-page set of instruction concerning Mother's own testimony and her proposed witnesses.

During the final hearing on March 19, 2019, Mother presented the testimony of Richard C. Alexander and Barry Grier, police officers at the 6th

---

[11] As discussed below, the trial court concluded that that Mother was properly served with notice of the January 24, 2019 hearing, but also concluded that even if Mother did not have actual notice of the hearing, any error by the trial court did not result in prejudice.

District in Philadelphia where custody exchanges occurred. The trial court, however, dismissed the additional witnesses Mother sought to present. The trial court ruled that those witnesses (1) were not included in Mother's witness list or (2) Mother offered the witnesses to authenticate documents that were already admitted into the record. *See* N.T., 3/12/19, at 29-40; *see also* Order, 2/11/19. In addition, Father testified on his own behalf.

The trial court again interviewed Child *in camera* on March 19, 2019. By that time, Father had been exercising primary physical custody for six months. Child was ten years old and attending fourth grade in the same parochial school in New Jersey. Child testified that, since he was "young," Mother slept in his bed with him at times, and she continues to do so. N.T., 3/19/19, at 16. In addition, Child testified that, since he was young, Mother walked around the house naked, and she continues to do so. *Id.* at 16-17. On inquiry by the trial court, Child testified:

[Q.] So, you want to keep living with [Father]?

[A.] Yes.

[Q.] And why do you want to do that?

[A.] Because he's nice. He doesn't walk around naked or anything.

[Q.] [W]hat else can you tell me about him as a parent?

* * *

[A.] He has a wife[,] and she's nice to me.

[Q.] How about the food[.] [D]o they cook good food for you?

- 12 -

[A.] Yes, they do.

[Q.] [W]hat kind of food?

[A.] Well, the[y] cook turkey wings. They cook chicken wings. They cook all that. And their house is stocked with food.

[Q.] Well, does your mother feed you when you go over?

[A.] Well, . . . there's not a lot of food.

*Id.* at 23.

By final order dated March 19, 2019, and entered on March 21, 2019, the trial court awarded the parties shared legal custody, Father primary physical custody, and Mother partial physical custody on alternating weekends from Friday at 4:00 p.m. until Sunday at 7:00 p.m. The trial court directed that the custody transfers continue to occur at the 6th Police District building in Philadelphia, and "[i]f either party is late or does not appear, it shall be recorded on the police log forms, copies of which have been provided to the parties." Order, 3/19/19. Further, the trial court dismissed Mother's petitions for contempt and denied her motion for recusal.

Mother timely filed *pro se* a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The trial court filed its Rule 1925(a) opinion on May 30, 2019.[12]

---

[12] Mother filed applications to correction of the original record on July 25, 2019, and August 30, 2019, which this Court denied without prejudice to seek relief in the trial court. Orders, 8/14/19 & 9/6/19. Mother
*(Footnote Continued Next Page)*

Of relevance to this appeal, the trial court noted:

While Mother was certainly warranted in being concerned when [C]hild said someone had touched him while he was sleeping at Father's home sometime in 2015, Mother should have realized after several agencies, including medical providers, failed to uncover any evidence that actual abuse occurred, that [C]hild's remarks were not grounded in reality. Instead, she continued to complain that [C]hild was molested at Father's home and insisted that [C]hild had said so, which he never did. Throughout these proceedings, [C]hild continued to express affection for Father and never once said to anyone that he did not want to see Father or spend time with him. Ironically, prolonging hearings due to Mother's complaints or requests about witnesses and/or records caused Mother's arbitrary change in [C]hild's school enrollment to be included in the issues before the court . . .[,] and the change in primary custody resulting from [Mother arbitrarily changing his school] provided an opportunity for [C]hild to greatly value and prefer living in Father's home. The disposition and demeanor of [C]hild after Father was awarded primary physical custody is evidence that

_(Footnote Continued)_ ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

subsequently filed a motion for reconsideration, which this Court denied. Order, 9/23/19.

On October 11, 2019, Mother filed an application for clarification and an application for relief. In her application for clarification, Mother sought an explanation for why her previous applications to correct the record were denied. Application for Clarification, 10/11/19, at 8 (unpaginated). In her application for relief, Mother made multiple allegations that Father was not providing Child necessary medical care while in his primary physical custody. Specifically, Mother requested that this Court direct Father "to stop sabotaging my effort in getting [Child] . . . medical attention he needs." Application for Relief, 10/11/19, at 7.

We deny Mother's application for clarification, but note that we have reviewed the materials submitted by Mother. We also deny Mother's application for relief. However, to the extent Mother has raised new claims that Father has not been following up with Child's medical appointments after the entry of the instant custody order, Mother may seek relief in the trial court.

- 14 -

the best interests of [C]hild have been truly served by that decision.

Trial Ct. Op., 5/30/19, at 22.

The trial court further found that Mother waived several of her claims based on a vague Rule 1925(b) statement and the failure to preserve issues in the trial court. *See* Trial Ct. Op., 5/30/19, at 15 (concluding Mother's claim that the trial court did not permit Mother to present witnesses lack adequate specificity to address on appeal), 19 (concluding "Mother's general allegations of bias, altering the record and not reading into the record report in their entirety" were not sufficiently identified in Mother's Rule 1925(b) and Mother did not proffer sections of any report omitted during the trial court's reading). The trial court determined that Appellant's other claims lacked merit.

On appeal, Mother presents eight issues, which we have reordered as follows:

[1]. Whether the trial court violated [Mother]'s constitutional right to due process of law?

[2]. Whether the trial court erred as a matter of law by permitting [Father]'s witness to testify regarding sexual abuse allegations without being certified as an expert while omitting medical records from a psychological evaluator that were vital to the case and refusing to allow witnesses subpoenaed by [Mother]?

[3]. Whether the trial court erred in omitting several records and video regarding occurrence of sexual abuse in [Father]'s home?

[4]. Whether the trial court showed personal bias and committed an error of law when the [c]ourt would not allow [Mother] to discuss education issue brought up by [Father]?

- 15 -

[5]. Whether the trial court erred in failing to grant petition for recusal based on showing of prejudice, improper demeanor, and bias towards [Mother]?

[6]. Whether the trial court erred in failing to address [Mother]'s contempt petitions filed throughout the pendency of the modification hearings?

[7]. Whether the trial court erred in refusing to grant a continuance for [Mother] to retain counsel?

[8]. Whether the trial court erred in failing to consider all the factors under 23 Pa.C.S. [§] 5328(a) as to what is in [C]hild's best interests?

Mother's Brief at 10.[13]

## Due Process

In her first four issues, Mother claims that the trial court violated her right to due process of law. Mother generally asserts that the trial court did not allow her "to speak, take the stand, cross-examine the witnesses, or call her witnesses to the stand." Mother's Brief at 17. Mother raises several arguments regarding: (1) her ability to admit evidence from the Consortium, (2) her ability to play the videos from PCA; (3) the trial court's limitations on her ability to present evidence regarding Child's education; (4) the trial court's failure to provide notice of the January 24, 2019 hearing; and (5) the trial court's rulings on witnesses, intake reports, medical records, and

---

[13] Mother uses lower case roman numerals to paginate her brief. We have used conventional page numbers when citing to her brief.

therapy notes Mother proffered to show that Child was molested or got sick at Father's house. We address each argument separately.

Due process requires an opportunity to be heard, and the chance to defend oneself in an impartial tribunal having jurisdiction over the matter. *In re J.N.F.*, 887 A.2d 775, 781 (Pa. Super. 2005). A party has a due process right "to present evidence provided that the evidence is relevant and not subject to exclusion under one of our established evidentiary rules." *See Commonwealth v. McGowan*, 635 A.2d 113, 115 (Pa. 1993).

This Court has stated:

When we review a trial court ruling on admission of evidence, we must acknowledge that decisions on admissibility are within the sound discretion of the trial court and will not be overturned absent an abuse of discretion or misapplication of law. In addition, for a ruling on evidence to constitute reversible error, it must have been harmful or prejudicial to the complaining party.

An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused.

*Phillips v. Lock*, 86 A.3d 906, 920 (Pa. Super. 2014) (citation omitted). Additionally, a court may, in its discretion, exercise reasonable control over the mode and order of examining witness. *Cf.* Pa.R.E. 611(a).

*The Consortium*

In her first issue, Mother argues that the trial court violated her due process rights with respect to witnesses and reports from the Consortium. Mother asserts that the trial court improperly precluded her from testifying

about Child's reports of sexual abuse to Dr. Varum Sharme. Mother's Brief at 47-48. Mother further contends that the trial court erred by allowing Father's witness, Levi Lee, who was Child's therapist from the Consortium, to testify even though he was not certified as an expert witness. *Id.* at 45.

In its Rule 1925(a) opinion, the trial court addressed the Consortium witnesses as follows:

> [T]he following describes evidence related to the Consortium.
>
> On May 17, 2017, Mother testified that [C]hild told "them" at the Consortium on November 19th and November 30th (2015) that he was molested at [Father]'s house. She then produced a document that appeared to be a Biopsychosocial Evaluation, dated November 30, 2015, which was marked and admitted as Exhibit M-2 during the hearing and is included in the record on appeal. . . . As set forth in the Evaluation, [C]hild said he felt he was being touched at night when he was asleep at Father's home and pointed to his penis when asked to show where. Additional entries from the Evaluation were read into the record, but nothing in the document stated anything different as to what [C]hild said happened to him. . . The signature of Varum Sharme, M.D., appears at the end.
>
> During that May 17th hearing, Mother did not at any time draw the court's attention to anything in the Evaluation which would corroborate her claim that [C]hild told "them" he was molested, nor does she cite any specific quotation from same in her general allegation of error on appeal.

*Id.* at 16-17 (record citations and footnotes omitted).

The trial court went on to note the testimony of Mr. Lee, Child's therapist from the Consortium. Importantly, the trial court noted that Mr. Lee "was not called to render an opinion as an expert, but rather to give fact

- 18 -

testimony about what [C]hild had said during therapy about any allegation

of abuse." N.T., 5/17/17, at 134-36. The trial court continued:

> On October 31, 2017. . ., a Vice President from the Consortium appeared pursuant to a subpoena from Mother. The witness had the record from the Consortium, which the witness said had previously been produced, and in fact the evaluation had been marked as an Exhibit on May 17, 2017. Accordingly, the witness was excused.
>
> During her testimony on September 21, 2018, the date referenced in her [asserted] error, Mother stated she wanted to subpoena [Dr. Sharme] from the Consortium and was advised that she should have subpoenaed witnesses to appear that day, which she had not yet done even though that was the fourth hearing date, but that another hearing date would be provided. Mother then began talking about a November 30, 2016 report from the Consortium—erroneously saying it was 2016 rather than 2015—which was the same report entered into evidence as Exhibit M-2 on May 17, 2017. Thus, since the report of Dr. Sharme had been . . . admitted into evidence, a repetition of this evidence was disallowed in the February [11,] 2019 order.
>
> With regard to "a second report" Mother writes about in this [asserted error], if the document to which she is referring is the second Evaluation of [C]hild as had been ordered by the court on January 13, 2018, it was not admitted into evidence because Father was present during the evaluation which, in the opinion of this court, wholly undermined its reliability. . . .

*Id.* at 18.

Based on our review of the record, we discern no abuse of discretion.

*See Lock*, 86 A.3d at 920. Despite Mother's claim, the trial court admitted

the evidence that Child made reports of sexual abuse at the Consortium.

Furthermore, although the trial court could have accepted Mr. Lee, who was

a treating therapist for Child, as an expert, it elected not to. Lastly, the fact

that the trial court did not accept Mother's argument that Child was abused

at Father's house does not amount to a due process violation or an error of law in the trial court's evidentiary rulings. Therefore, Mother's first issue merits no relief.

*PCA Videos*

Mother next argues that the trial court erred by failing to admit into evidence of two videos of interviews of Child at PCA regarding his sexual abuse allegation. Mother's Brief at 54.

The trial court explained in its Rule 1925(a) opinion:

> On November 30, 2016, th[e] court attempted to play the DVD provided by [PCA] showing the interview of [C]hild on November 13, 2015, but the DVD malfunctioned. N.T., 11/20/16, at 65-69. On September 21, 2018, notes of the interview set forth in [PCA]'s report were read into the record and the report itself– [PCA] Team Interview Summary–has been included in the record on appeal. . . .

Trial Ct. Op., 5/30/19, at 7 (record citation and footnote omitted).

We discern no merit to Mother's contention that the trial court improperly precluded Mother from playing the contents of the DVD showing the PCA interview of Child. The trial court was aware that Child reported the possibility of abuse at PCA and interviewed Child several times *in camera*. It was within the discretion of the trial court to decline a second attempt to play the DVD of the interview. Therefore, this claim fails.

*Education Issues*

In her next issue, Mother asserts that the trial court erred by not allowing her to discuss the "education issue" raised by Father. Mother

argues that the trial court precluded her from explaining why she transferred Child from parochial to public school. Mother's Brief at 30. Mother also asserts that the trial court improperly limited her ability to cross-examine Father or present evidence regarding education issues. Mother claims that the trial court's rulings prevented her from rebutting Father's allegations that he cared about or promoted Child's education and that Mother did not. *Id.* at 31-35.

The trial court responded to this claim by focusing on Mother's decision to change Child's school. Trial Ct. Op., 5/30/19, at 15. The trial court noted Mother's explanation that she changed Child's school because Father was concerned about Child's performance at the former parochial school. *Id.* The trial court, however, determined that Mother's explanation was not credible in light of the contentious relationship between Mother and Father. *Id.* The trial court added:

> While Mother was not given the opportunity to explain further about the school change when the issue was first raised, the court inquired about it later, and Mother claimed that [C]hild was doing well in the new school, it was not good to just uproot him from the new school[,] and he had had low scores in reading at [the parochial school]. . . . She produced no documents in support of her claims, and since . . . the new school year [was] just underway, a disruption in [C]hild's adjustment to a new school environment would not have been significant.

*Id.* at 15-16 (record citation omitted). In light of the foregoing analysis, which was supported by the record, we discern no merit to Mother's claim

that the trial court precluded her from explaining her decision to change Child's school.

The trial court did not respond to Mother's assertions that the court limited her ability to cross-examine Father and precluded her from presenting evidence regarding other education issues. Nevertheless, a review of the record reveals that these claims are meritless. Mother was able to cross-examine Father regarding educational issues. *See* N.T., 9/21/18, at 74-81, 97-105, 114-115, 121-124. During this cross-examination, however, the trial court did not allow Mother to characterize Father's prior testimony, testify about her reasons for changing Child's school, and admit the attendance record of Mother's other child while cross-examining Father.

Moreover, during her own testimony, Mother focused on admitting documents and making arguments that Child was abused. The trial court warned that Mother testimony should be limited to her personal observations and if she failed to comply, she would be excused as a witness. *Id.* at 147. When Mother repeatedly failed to comply with the trial court's instruction, the trial court excused her as a witness. *Id.* at 197. It was only after the trial court issued its ruling to excuse Mother that Mother attempted to testify and call witnesses regarding Child's education.

Based on this record, we discern no abuse of discretion in the trial court's attempts to control the order and mode of presenting evidence. *See*

*Lock*, 86 A.3d at 920; *cf.* Pa.R.E. 611(a). We acknowledge that Mother was *pro se* at the time. We also acknowledge that some of the exchanges between Mother and the trial court were less than decorous. However, we find no merit to Mother's claim that the trial court improperly denied her the opportunity to present her evidence regarding Child's education. *See McGowan*, 635 A.2d at 115.

*Failure to Provide Notice of the January 24, 2019 Hearing*

Mother also argues that the trial court prevented her from appearing at a hearing. Mother's Brief at 20-25. Mother insists that the trial court failed to provide notice of the January 24, 2019 hearing and then altered the record to establish that it provided notice of the hearing. *Id.* In support, she refers to a copy of the trial court docket that was printed on January 7, 2019, the same day the trial court entered the scheduling order for the January 24, 2019 hearing. She also notes that the January 7, 2019 order bears a handwritten indication that the order was entered in 2018.

The trial court concluded as follows:

The [trial court's] secretary testified on March 19, 2019 that she mailed the order to the parties on or about January 7th, after it was entered, as was noted on the order itself bearing a stamp "copies sent." While the [trial court's] secretary inadvertently neglected to complete the steps to make the hearing notice a docket entry, that does not negate that an order was typed into the record and that copies were mailed.

Even if Mother had not received the notice due to some mailing aberration, . . . Mother was not prejudiced by her absence on January 24, 2019 since nothing substantive occurred other an

> interview of [Child] and a general inquiry as to how he was progressing.

Trial Ct. Op., 5/30/19, at 20.

Following our review, we discern no merit to Mother's argument that the trial court intentionally prevented her from appearing at the January 24, 2019 hearing. Moreover, the record supports the trial court's conclusion that even if Mother did not receive actual notice of the hearing, the matter was continued without any substantive evidence being taken. Accordingly, we find no due process violation.

*Intake Reports, Medical Records, and Therapy Notes*

Mother's next argument focuses on the trial court's preclusion of testimony from other witnesses and reports, generally. Mother's Brief at 17-19. This claim appears to relate to the trial court's preclusion of reports from JJPI, and St. Christopher's, as well as other reports Mother claims were necessary to establish her claims. However, the trial court admitted numerous documents from these organizations. Therefore, Mother's claim fails.

*Other Witnesses*

Mother also argues that the trial court erred in admitting other witnesses, including two witnesses from DHS and JJPI. However, it is well settled that any issue not raised in a Rule 1925(b) statement is waived on appeal. **See** Pa.R.A.P. 1925(b)(4)(vii); **Dietrich v. Dietrich**, 923 A.2d 461, 463 (Pa. Super. 2007) (stating that when an appellant filed a Rule 1925(b)

statement, any issues not raised in that statement are waived on appeal).

Further, this Court has held that a Rule 1925(b) statement "which is too vague to allow the court to identify the issues raised on appeal is the functional equivalent of no [c]oncise [s]tatement at all." ***Commonwealth v. Dowling***, 778 A.2d 683, 686-687 (Pa. Super. 2001). We explained:

> Rule 1925 is intended to aid trial judges in identifying and focusing upon those issues which the parties plan to raise on appeal. Rule 1925 is thus a crucial component of the appellate process.
>
> "When a court has to guess what issues an appellant is appealing, that is not enough for meaningful review." "When an appellant fails adequately to identify in a concise manner the issues sought to be pursued on appeal, the trial court is impeded in its preparation of a legal analysis which is pertinent to those issues."

***Dowling***, 778 A.2d at 686 (citations omitted).

Instantly, aside from the issues we have discussed above, Mother's Rule 1925(b) statement contained the following references to due process and the trial court's preclusion of witnesses and reports:

> (1) the trial court "violated [Mother's] rights for a due process hearing with her intimidation to control [Mother's] statements of events regarding the issues that stem from the first filing in regards to this matter that began on December 2014[;]"
>
> (2) the trial court "sabotage[d Mother's] case by controlling my statement for the record, submitting evidence, prevent[ing Mother] from calling witnesses to the stand to testify to my accounts of the events that were relevant to this case[;]"
>
> (4) the trial court entered "into evidence a second report from a . . . the [C]onsortium [and] stated on September 21, 2018, that the doctor who wrote the report that was read into record . . . can be subpoenaed and then [the trial court] turned around and

- 25 -

banned anyone from the [Consortium from testifying at the] March 19, 2019, hearing[;]" and

(5) the trial court "omitted relevant documents regarding sexual abuse concerns."

Mother's Rule 1925(b) Statement.

Following our review, we agree with the trial court that Mother's Rule 1925(b) statement did not identify her assertion that the court precluded her from calling witnesses and reports. Therefore, this issue is waived. **See Dowling**, 778 A.2d at 686.

In sum, having reviewed Mother's first four issues and her related arguments regarding the preclusion of evidence, we conclude that Appellant has not demonstrated that her due process rights were violated.

**Recusal**

In her fifth issue, Mother claims that the trial court erred in denying her motion for recusal. She asserts that the trial court "was unfair and prejudice[d] and showed favor to Father in all the hearings. . . . The judge did not listen to second filed recusal on February 25, 2019, before denying it (See N.T., 3/19/19)." Mother's Brief at 27.

We review a trial court's decision to deny a motion to recuse for an abuse of discretion. **Vargo v. Schwartz**, 940 A.2d 459, 471 (Pa. Super. 2007). Our review of a trial court's denial of a motion to recuse allows for deference to the trial court's decision on the matter. **Id**. (stating that "we extend extreme deference to a trial court's decision not to recuse"). In **Commonwealth v. Harris**, 979 A.2d 387, 391-392 (Pa. Super. 2009), this

Court stated, "We recognize that our trial judges are 'honorable, fair and competent,' and although we employ an abuse of discretion standard, we do so recognizing that the judge himself is best qualified to gauge his ability to preside impartially." *Harris*, 979 A.2d at 391-392, (quoting, in part, *Commonwealth v. Bonds*, 890 A.2d 414, 418 (Pa. Super. 2005)).

In order to prevail on a motion for recusal, the party seeking recusal must "produce evidence establishing bias, prejudice or unfairness which raises a substantial doubt as to the jurist's ability to preside impartially." *In re S.H.*, 879 A.2d 802, 808 (Pa. Super. 2005) (quoting *Arnold v. Arnold*, 847 A.2d 674, 680–81 (Pa. Super. 2004)).

Instantly, the record reveals that Mother filed a motion for recusal on September 6, 2018. During the hearing on September 21, 2018, Mother made the same assertions as in the foregoing issues on appeal, namely, that the trial court denied her the ability "to speak, take the stand, cross-examine the witnesses, or call her witnesses to the stand." Mother's Brief at 27; *see also* N.T., 9/21/18, at 6-11. The trial court denied Mother's recusal request on the record in open court on the same date. *See* N.T., 9/21/18, at 7. For the same reasons we have concluded that Mother's due process issues on appeal do not warrant relief, we discern no abuse of discretion by the trial court in denying Mother's first motion for recusal. *See Vargo*, 940 A.2d at 471.

In addition, Mother filed a motion for recusal on February 25, 2019, which the trial court denied on the record in open court during the March 19, 2019 hearing. *See* N.T., 3/19/19, at 102. Mother asserts the trial court erred in denying her the opportunity to address her motion during that hearing. We disagree.

The trial court stated as follows in its Rule 1925(a) opinion: "The court was acutely aware of Mother's accusations of bias, almost from the beginning, and did not intend to needless[ly] expend judicial resources so that Mother could again verbalize the complaints she had repeatedly expressed in prior hearings." Trial Ct. Op., 5/30/19, at 21. We again discern no abuse of discretion by the trial court based on the totality of record evidence. *See Vargo*, 940 A.2d at 471.

### Mother's Contempt Petitions

In her sixth issue, Mother asserts that the trial court failed to address her contempt petitions, which the certified docket reveals she filed *pro se* on July 30, 2015, September 17, 2018, October 10, 2018, December 7, 2018, February 27, 2019, and March 11, 2019.[14]

---

[14] As discussed above, Father also filed *pro se* multiple petitions for contempt against Mother.

We review the trial court's finding on Mother's contempt petitions according to an abuse of discretion standard. **See Flannery v. Iberti**, 763 A.2d 927, 929 (Pa. Super. 2000) (citations omitted).

Instantly, the trial court noted that it issued the interim custody order granting Father primary custody on September 21, 2018. The trial court concluded that because Mother's first two contempt petitions based on the former custody order were of less significance than Father's compliance with the September 21, 2018 interim order. Trial Ct. Op., 5/30/19, at 21.

Mother fails to present any discussion in her brief with respect to why her contempt petitions filed before September 21, 2018 remained relevant at the time of the March 19, 2019 hearing. As such, Mother's claim regarding the petitions is waived. **See In re W.H.**, 25 A.3d 330, 339 n.3 (Pa. Super. 2011) (stating that issues are waived if appellate brief fails to provide meaningful discussion with citation to relevant authority); **see also** Pa.R.A.P. 2119(b).

To the extent Mother argues that the trial court failed to address her petitions filed after September 21 2018, the record reveals that Mother refused to present any testimony in support of those petitions. **See** N.T., 3/19/19, at 97-102. Rather, Mother stated that she would file an appeal due to the trial court's refusal to address her earlier petitions. N.T., 3/19/19, at 97, 101-02. Therefore, Mother's argument that the trial court refused to

address her contempt petitions filed on October 10, 2018, December 7, 2018, February 27, 2019, and March 11, 2019, is without merit.

### Mother's Requests for Continuances

In her seventh issue, Mother asserts that the trial court erred in refusing to grant her continuance request to retain counsel. Specifically, Mother asserts that she "attempted to hire a lawyer on February 26, 2019 . . . . . The judge denied Mother's request on March 6, 2019. . . . Mother finally spoke with [A]ttorney Marshall, and he decide[d] to take the case, and he planned to ask the Judge for a continuance to prepare, and she turned him down flat. . . ." Mother's Brief at 58-59.

We apply an abuse of discretion standard of review when considering the denial of a continuance request. *In the Interest of D.F.*, 165 A.3d 960, 965 (Pa. Super. 2017).

With respect to its order denying Mother's February 26, 2019 request, the trial court explained:

> Since hearings on this case had been going on for more than three years, it was imperative that a final disposition be entered and Mother had sufficient time to obtain counsel after choosing to proceed *pro se* during the second hearing. Thus, because it was imperative to conclude the matter as soon as possible, and the hearing date was set after the court intervened to find a date as soon as possible after Mother's failure to appear on January 24, 2019, the continuance request was denied.

Trial Ct. Op., 5/30/19, at 22.

We find no abuse of discretion in the trial court's decision to deny Mother's request for a continuance following the January 24, 2019 hearing.

- 30 -

Mother insisted on proceeding *pro se*, and the trial court attempted to accommodate Mother's attempts to argue her position and present evidence.[15] However, Mother was not able to follow the trial court's directions. As noted above, this resulted in the trial court excusing Mother during her formal testimony on September 21, 2018. It was not until shortly before the final hearing on March 19, 2019, Mother formally moved for a continuance to obtain representation. Based on this record, we will not disturb the trial court's decision denying Mother's request for a continuance.

Moreover, we note that during the March 19, 2019 hearing, Attorney Marshall stated on the record in open court, "Do you think that you could give us an opportunity over a couple of weeks to work it out?" N.T., 3/19/19, at 27. The trial court responded, "No." *Id.* To the extent Attorney Marshall requested the trial court continue the case so that the parties may attempt to settle, we discern no abuse of discretion. This was a highly contentious and protracted custody case, and the trial court did not err in denying the request of Mother's counsel.

**The Trial Court's Final Custody Order**

Mother asserts that the trial court did not adequately weigh all the factors under 23 Pa.C.S. § 5328. Mother's Brief at 53. Mother further contends that the trial court failed to consider all custody factors. *Id.*

---

[15] *See* N.T., 5/17/17, at 37-89.

We review Mother's issues according to the following scope and standard of review:

> [T]he appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it. . . . However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination. . . . Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.

> *R.M.G., Jr. v. F.M.G.*, 986 A.2d 1234, 1237 (Pa. Super. 2009) (quoting *Bovard v. Baker*, 775 A.2d 835, 838 (Pa. Super. 2001)). Moreover,

> [O]n issues of credibility and weight of the evidence, we defer to the findings of the trial [court] who has had the opportunity to observe the proceedings and demeanor of the witnesses.

> The parties cannot dictate the amount of weight the trial court places on evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.

> *R.M.G., Jr.,* 986 A.2d at 1237 (internal citations omitted). The test is whether the evidence of record supports the trial court's conclusions. *Ketterer v. Seifert*, 902 A.2d 533, 539 (Pa. Super. 2006).

*A.V. v. S.T.*, 87 A.3d 818, 820 (Pa. Super. 2014) (some formatting altered).

In addition,

[T]he discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

*Ketterer*, 902 A.2d at 540.

The primary concern in any custody case is the best interests of the child. "The best-interests standard, decided on a case-by-case basis, considers all factors that legitimately have an effect upon the child's physical, intellectual, moral, and spiritual well-being." *Saintz v. Rinker*, 902 A.2d 509, 512 (Pa. Super. 2006).

Child custody actions are governed by the Child Custody Act, 23 Pa.C.S. §§ 5321-5340. Trial courts are required to consider "**[a]ll** of the factors listed in section 5328(a) . . . when entering a custody order." *J.R.M. v. J.E.A.,* 33 A.3d 647, 652 (Pa. Super. 2011) (emphasis in original); *see also A.V.*, 87 A.3d at 823 (citation omitted) (providing that trial courts shall set forth the mandatory assessment of the Section 5328(a) best interest factors "prior to the deadline by which a litigant must file a notice of appeal"). This statutory section provides as follows:

**(a) Factors.**—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

- 33 -

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one

another.  A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328(a).

Instantly, at the conclusion of the hearings, the trial court considered all of the statutory best interest factors on the record in open court.  *See* N.T., 3/19/19, at 116-28.  In its Rule 1925(a) opinion, the trial court reiterated its consideration of the factors.  *See* Trial Ct. Op., 5/30/19, at 8-14.  The trial court weighed Section 5328(a)(3), (4), (7), (9) through (11), and (13) in favor of Father, and it weighed none in favor of Mother.  The trial court weighed Section 5328(a)(1), (2.1), (5), (6), (8), (12), (14), and (15) equally between the parties.  Finally, the trial court found Section 5328(a)(2) inapplicable.

A review of the record shows that the evidence supports the trial court's findings with respect to all of the factors.  In considering the factors, the trial court found Mother's allegations of neglect, physical, or sexual abuse of Child by Father or anyone in Father's house not credible.  Specifically, the trial court found determinative the factors that it weighed in favor of Father.  With respect to Section 5328(a)(3), the parental duties

performed by each party, and Section 5328(a)(4), the need for stability and continuity in the child's education, family life, and community life, the trial court found as follows:

> The fact that Mother arbitrarily changed [C]hild's school without a valid reason[16] and enrolled him in a low performing school, whereas Father immediately re-enrolled him in a parochial school when he was awarded primary physical custody, showed that Father is more reliable for performance of important parental duties such as education. In addition, Father purchased a pair of shoes for [C]hild to be kept at school so he would be compliant with uniform requirements during Mother's periods of custody when he would wear tennis shoes, evidencing particular attention to the needs of [C]hild.
>
> *   *   *
>
> Father was awarded primary physical custody of [C]hild, as opposed to continuing a shared physical custody arrangement, and Mother was awarded partial physical custody on two out of every three weekends after Mother arbitrarily changed [C]hild's school enrollment and her schedule of weekends was cut back to alternating weekends after [C]hild spoke about conditions in Mother's home, i.e., that she slept in bed with him and walked around the house naked. . . .

*Id.* at 9-10.

With respect to Section 5328(a)(7), the well-reasoned preference of the child, based on the child's maturity and judgment, the trial court found as follows:

> On November 30, 2016, [C]hild told of activities he does with Mother and Father—helps mom with baking sometimes and plays

---

16 We address Mother's claim that the trial court improperly prevented her from explaining her decision to change Child's school below in greater detail.

games and sports with [Father]. He thought both were good parents, both hit him on his buttocks when he does something wrong—Mother with her hand and Father with the belt, and when asked, said he would like to spend more time at Father's because it's more fun. [Child] was not asked about any touching at Father's. On May 17, 2017, when asked what he told the social worker who came to Father's [house] (an indirect way of ascertaining if [C]hild would talk about being touched in his sleep) he said he forgot other than saying he likes to live with both parents and he said "no" when asked if he had any worries about someone coming into his room.

On January 30, 2018, he said he was happy because he loves both parents and he would not want to change schools. When asked if anyone hurts him at either parent's [homes] he said somebody touched him when he was sleeping at [Father]'s when he was two, three, four, five, six, seven and eight.

On January 2[4], 2019, after primary physical custody had been changed and [C]hild had been living with Father during the week and with Mother two out of every three weekends, [C]hild said he loves his new school, that it has been fun staying at his Father's, that Mother does not call him when he is with Father, and that he does not want to live with Mother more than with Father because she sleeps in bed with him and walks around naked. He even complained about the two out of every three weekends because he misses basketball practice and games on Saturday and Sunday because Mother does not take him. He said he did not remember what the big problem was supposed to be about what happened at Father's [house].

The interviews with [C]hild, . . ., showed a transition from when [C]hild showed affection for, and satisfaction with, both parents, to a clearly articulated preference for living primarily with Father and wanting to limit his custody time with Mother for specific, valid reasons.

*Id.* at 11-12.

With respect to Section 5328(a)(9), which party is more likely to maintain a loving, stable, consistent, and nurturing relationship with the child adequate for the child's emotional needs, and Section 5328(a)(10),

which party is more likely to attend to the daily physical, emotional, developmental, educational, and special needs of the child, the trial court found as follows:

> The environment in Father's home as described by [C]hild, was stress-free and warm[,] and he enjoyed living with Father and his Stepmother who cared for him. While in Mother's custody, [C]hild seemed to spend more time at the home of Maternal Great Grandmother, for whom Mother provides in-home care. Mother's habits of sleeping in bed with [C]hild and walking around the house without clothes, which she said she is entitled to do, could have serious emotional consequences for [C]hild, about which Mother is wholly oblivious. And Mother apparently videotaped an interview with [C]hild as noted in the PCA Report, where she was asking him questions about whether he was touched, which would have been wholly inappropriate.
>
> \* \* \*
>
> Mother arbitrarily changed [C]hild's school for no valid reason where the new school was a low performing school. And, according to [C]hild, Mother did not take him to practice or games on weekends she had custody. On the other hand, Father has demonstrated constant concern about how [C]hild is doing in school, how he works with [C]hild on homework, they ride bikes and Father enrolled him in basketball and told his grown siblings about [C]hild's basketball games. . . . [D]uring her testimony, Mother neither described what she does for [C]hild nor how she spends time with him.
>
> On November 30, 2016, when Mother was questioned by the court about why she sleeps with [C]hild in his bed, she first said that [C]hild ran into her room because he is petrified of the dark because of what happened at Father's[,] and she was naked because that is how she sleeps. When advised that [C]hild said she came into his room, she changed her explanation to say he sleeps with a flashlight and sometimes he asks her to sleep with him[,] but she is not naked when she does this. When asked why she sleeps without clothes with young children in the house and what would happen if there was an emergency, she said that is her right.

> In addition, it appears that when [C]hild said he thought someone touched him in his sleep at his Father's home, she seized upon it to make repeated complaints about Father, causing [C]hild to have to repeat what he said to numerous strangers, and showing no effort whatsoever to try to understand if anything inappropriate had actually occurred.

*Id.* at 12-13.

With respect to Section 5328(a)(11), the proximity of the residences

of the parties, the trial court found:

> While Father lives in New Jersey and Mother lives in Philadelphia, both have cars such that custody exchanges do not present a challenge[.] Father has always borne the burden of going the further distance for exchanges such that [C]hild's attendance at school during Father's custody time was not impacted. However, Mother cannot be relied upon to transport [C]hild to and from school during the week, as Father did on a regular basis when [C]hild attended school in Philadelphia such that her custody time cannot occur during the school week.

*Id.* at 13.

Finally, with respect to Section 5328(a)(13), the level of conflict

between the parties and the willingness and ability of the parties to

cooperate with one another, the trial court found as follows:

> Child's statement about being touched when he was sleeping at Father's home sparked conflicts between the parties because of how Mother chose to deal with it. [Mother] continues to insist that an incident of abuse occurred despite repeated, persuasive evidence that was only an impression [C]hild had after a dream. Mother complained that ever since Father got married he treats [C]hild badly, revealing a possible motive for her constant complaints about Father.

*Id.* at 14 (record citation omitted).

Following our review, we conclude that the trial court carefully and thoroughly considered all of the Section 5328(a) best interest factors on the record in open court at the conclusion of the hearing and in its Rule 1925(a) opinion. *See* N.T., 3/19/19, at 116-28; Trial Ct. Op., 5/30/19, at 8-14. Moreover, because the record supports the trial court's conclusions, we discern no abuse of discretion in this regard. Therefore, Mother's issue fails.

Order affirmed. Mother's applications for clarification denied as moot. Mother's application for relief denied without prejudice.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/23/20